288 So.2d 31 (1973)
Mrs. Marion L. BRIGNAC, Individually and as Usufructuary
v.
Elliott P. BOISDORE.
No. 53309.
Supreme Court of Louisiana.
December 3, 1973.
Rehearing Denied January 11, 1974.
Conrad Meyer, IV, Baldwin, Haspel, Molony, Rainold & Meyer, New Orleans, for defendant-respondent.
James R. Conway, III, Bridgeman & Conway, New Orleans, for plaintiff-applicant.
Charles B. Johnson, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for Total Community Action, Inc.
CALOGERO, Justice.
Mrs. Marion L. Brignac sued Elliott P. Boisdore to recover the rent due her for September 1969, the last month on a lease of the premises at 1624 Dryades Street in New Orleans. Boisdore then filed a third party demand against Total Community Action, Inc. (T.C.A.) to recover the rent due for the month of September 1969 on a sublease of the same property. T.C.A. reconvened against Boisdore, its lessor, and *32 third partied Brignac, the owner of the leased premises, seeking to be reimbursed the cost of repairs to the first floor of the leased premises.
The trial court awarded judgment in favor of Brignac against Boisdore for the rent due her ($550.00), in favor of Boisdore against T.C.A. for the rent due him ($1,777.35), and in favor of T.C.A. against Brignac for the cost of repairs to the floor ($1,776.50).
The Court of Appeal amended Brignac's $550.00 judgment against Boisdore by allowing additionally 10% attorney's fees, affirmed Boisdore's $1,777.35 judgment against T.C.A. noting that T.C.A.'s appeal from such judgment was not effective because the appeal bond had not been timely filed, and reversed T.C.A.'s third party judgment against Brignac, that is, the Court denied T.C.A. recovery of floor repair costs from Brignac.
We granted writs on the application of T.C.A. 275 So.2d 865 (La.1973).
Brignac leased the 1624 Dryades St. premises to Boisdore on March 28, 1966. That lease was for three years (until and through March 31, 1969) at a monthly rental of $550.00. Prepaired by Brignac on the standard form lease of commercial property, the Brignac lease prohibited any sublease except with the consent of the owner/lessor. It further stipulated:
"Lessee assumes responsibility for the condition of the premises and Lessor will not be responsible for damage caused by leaks in the roof, by bursting of pipes by freezing or otherwise, or by any vices or defects of the leased property, or the consequences thereof, except in the case of positive neglect or failure to take action toward the remedying of such defects within reasonable time after having received written notice from Lessee of such defects and the damage caused thereby. Should Lessee fail to promptly so notify Lessor, in writing of any such defects, Lessee will become responsible for any damage resulting to Lessor or other parties." (Emphasis added)
On March 31, 1966 Boisdore entered into a sublease with T.C.A. with the approval of Brignac, as required by his lease with her. This sublease, prepared by T.C.A., was for three years (until March 31, 1969) at a monthly rental of $1,777.35. It required Boisdore to make certain improvements to the premises. These improvements were completed by Boisdore at a cost in excess of $25,000.00. The sublease provided:
"Landlord shall maintain the leased premises located on the above described property, but Tenant shall be responsible for all damages caused by its fault or neglect and for the cleanliness of the leased premises, and upon the expiration or prior termination of this lease agrees to deliver the same in good order, normal wear and tear excepted. Landlord shall maintain fire and extended coverage insurance on the leased premises, and in the event of damage or destruction shall proceed diligently to restore the same to their condition prior to such occurrence.
". . .
". . .
". . .
". . .
"In the event that Landlord shall default in any of its obligations hereunder, and such default shall continue for a period of thirty (30) days following notice thereof from Tenant, Tenant may at its option (a) cancel this lease or (b) perform such obligations, deducting the cost thereof from the installments of rent thereafter due, and may hold Landlord liable for any damages suffered by reason of such default." (Emphasis supplied)
Both the lease and the sublease were extended to September 30, 1969 by the consent *33 of the parties to the respective contracts. On March 28, 1968, eighteen months before the date on which both lease and sublease were to expire, Brignac leased the same Dryades St. premises directly to T.C.A. for a one year term to commence on October 1, 1969 at a monthly rental of $875.00. That lease gave to T.C. A. options to renew it through September 30, 1972, with appropriate increments in the monthly rental payments.
On August 22, 1969, 39 days before the expiration of the Boisdore-T.C.A. sublease (and the Brignac-Boisdore lease as well) T.C.A. sent the following letter to Boisdore by certified mail as required by their sublease.
 August 22, 1969
Mr. Elliott P. Boisdore
1839 Agriculture Street
New Orleans, Louisiana
 RE: 1624-26 Dryades Street
Dear Mr. Boisdore:
After repeated attempts to get you to repair the floor at 1624-26 Dryades
Street, for which you maintained you were not responsible, I asked our
attorney to give us a legal opinion, a copy of which is attached.
This has become a definite hazard and we now find it necessary to proceed
with these repairs and to deduct it from the rent. The estimate we
have received for this work is $1,776.50.
Unless we hear from you by August 27, 1969, we will begin the work. If
you wish further details about this, please contact Mr. Guy West, 529-5602.
 Sincerely,
 Nancy Z. Roe (Mrs.)
 Director of Administration
cc: ICB
 Billy Paletou
 Guy West
 Henry Tilly
The record indicates that T.C.A.'s contractor, Henry Tilly, performed certain repairs on the floor and completed what work he did by September 10, 1969.
T.C.A. refused to pay Boisdore the rent due him for September 1969, the concluding month under the sublease (it had been due on September 1). Boisdore in turn did not pay Brignac the September 1969 rent due her under the Brignac-Boisdore lease, whereupon Brignac filed the lawsuit which precipitated the various claims and counterclaims in this litigation.
The sole question presented for our review is which of the parties T.C.A. or Brignac, should bear the cost of what work was done to the leased premises by Henry Tilly.[1]
*34 There is no dispute that the floor of the leased premises was in need of repairs at the time T.C.A. undertook to effect such repairs. The responsibility for making these repairs was placed on the lessor and sub-lessor by the lease and sublease respectively. The Court of Appeal properly concluded nonetheless that T.C.A. could not be reimbursed the cost of the repairs based upon either the Brignac-Boisdore lease or the Boisdore-T.C.A. sublease.
T.C.A. was not a party to the Brignac-Boisdore lease and thus has no rights against Brignac based upon that lease. Furthermore, Brignac has no liability under that contract for the repairs made as she never received written notice of the need for the repairs nor was she afforded a reasonable time to effect the repairs both prerequisites to her liability for repairs under her lease with Boisdore.
T.C.A. has no contractual rights against Boisdore based upon their sublease with him because they failed to abide by the written notice-thirty day delay requirement of the sublease.
The pertinent article of the Civil Code is Article 2694 which reads:
"Art. 2694. If the lessor do not make the necessary repairs in the manner required in the preceding article, the lessee may call on him to make them. If he refuse or neglect to make them, the lessee may himself cause them to be made, and deduct the price from the rent due, on proving that the repairs were indispensable, and that the price which he has paid was just and reasonable."
The jurisprudence interpreting this article has held that unless the lessee is able to show that he called upon the lessor to make the repairs and that he refused to do so, then the lessee may not recover from the lessor for the repairs made. See Mullen v. Kerlec, 115 La. 783, 40 So. 46 (1905); Hartz v. Stauffer, 163 La. 382, 111 So. 794 (1927); Ellis v. Brenner, 34 So.2d 633 (La.App.2d Cir. 1948); Teekell v. Drewett, 103 So.2d 525 (La.App.2d Cir. 1958).
The written notice-third day delay requirement of the sublease, as well as the written notice-reasonable time requirement of the lease, do not derogate from Article 2694, rather both merely specify under what particular circumstances the option of repairing and deducting may be exercised.
There is simply no basis upon which T. C.A. may now claim that it is not bound to the delay provision limiting resort to the cancel-repair option. This conclusion is made even more inescapable when it is realized that T.C.A. drafted the lease and its notice-delay provision; that T.C.A. was aware of the need to repair the floor as early as January 1968 (eight months prior to the giving of notice); and that T.C.A. was in communication with its attorney relative to the liability for the floor as evidenced by the August 22, 1968 notification letter to Boisdore. These facts combine to argue strenuously that T.C.A. has failed to prove the equities which could possibly overcome the failure to follow the article 2694 procedure as explained in the lease. See Ellis v. Brenner, 34 So.2d 633, 636 (La.App.2d Cir. 1948).
T.C.A. argues that if it is precluded from recovering the cost of the repairs in contract (and that is the case here), then it may nonetheless be reimbursed under the action de in rem verso, which is an action for unjust enrichment founded upon the general principle of equity that one person should not be enriched at the expense of another. It was first clearly enunciated in our law by the decision of this Court in Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1968). *35 We explained the doctrine there as follows:
"There is a general concept of quasi contractual obligations; it is a concept based upon the principle that where there is an unjust enrichment of one at the expense or impoverishment of another, then the value of that enrichment or else, in some cases, the amount of the impoverishment must be restituted. Planiol, Traite Elementaire De Droit Civil, T.2, n° 812, n° 813 (8th ed. 1939).
"Under this general theory of quasi contractual obligations founded upon an unjust enrichment we find the civil law action de in rem verso. See Nicholas, Unjustified Enrichment in Civil Law, Part I, 36 Tul.L.Rev. 605 (1962), Part II, 37 Tul.L.Rev. 49 (1962). The actio de in rem verso, although recognized by this Court long ago, was not treated definitively and was only applied in the two cases to which we referred above. Garland v. Scott's Estate, 15 La.Ann. 143 (1860); Payne & Harrison v. Scott, 14 La.Ann. 760 (1859).
". . .
". . .
"As Nicholas points out, in France the action has rightfully been subjected to limitations by the courts in its application. For, as he observes, `unregulated discretion is ultimately the negation of law.' There are now five prerequisites to the successful suit by actio de in rem verso: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of `justification' or `cause' for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i. e., the action is subsidiary or corrective in nature. 36 Tul.L.Rev. 605, 610." 251 La. at 650-652, 205 So.2d at 432 (footnote omitted, emphasis supplied). See also Comment, Actio De In Rem Verso in Louisiana: Minyard v. Curtis Products, Inc., 43 Tul.L.Rev. 263 (1969).
Turning our attention to the case at hand, we find that resort to the action de in rem verso is not applicable on the facts of this case. At the outset, T.C.A. has failed to establish the first of the five prerequisites required before de in rem verso may be applied, viz. that there be an enrichment.
Our review of the record fails to reveal that T.C.A. has borne their burden of proving an enrichment. There is no proof of the precise nature of the work done by Tilley, or its extent, nor any consequent improvement to the leased premises.
T.C.A. admittedly contends that Brignac has been enriched by the completion of certain repairs to the first floor of its leased building in the amount of $1,776.50. And, of course, there was a showing that T.C.A. paid Tilley this sum to repair the first floor of the leased premises. This showing of payment only goes to establish T.C.A.'s impoverishment, the second prerequisite.[2] Insufficient evidence was offered by T.C.A. to establish the purported enrichment of Brignac. Not only are we unable to find support for T.C.A.'s assertion of Brignac's enrichment in the record, but we find testimony from two *36 witnesses produced by T.C.A. that goes to establish a lack of enrichment.
Mr. Guy West, Executive Director since January 1969 of the Central City Neighborhood Development Center which occupied the leased premises, testified relative to the condition of the first floor. He had been employed in one capacity or another at the Dryades Street Office (the leased premises) since May of 1967. Questioned by T.C.A.'s attorney, he testified as follows:
Q. While you have been up at the Central City location on Dryades Street, has there been any occasion to have any repairs made to the floor, the first floor?
A. Yes, there have been.
Q. In fact, are there occasions now?
A. They should be repaired now.

Q. Could you tell the Court what floor repairs were made and when they were repaired?
A. The floor, on the first floor, well, I can go back as far as 1967 when I first came to the building. It was obvious that the building was sinking somewhat in 1967 and, in 1969, I think it was, repairs were made on the floor. The entire first floor was basically deteriorating. There were holes in the floor, literally. There were holes because of the fact that when the flooring was taken up, I personally observed and watched the men who were doing the work, it was completely rotten because there was nothing but mud touching the flooring that had been put down there and basically there was nothing that could be done to prevent this in the future except to continue to put more wood down and that would continue to rot because the mud was right under it.
Q. And presently, today, what is the condition of the floor?
A. We have repaired the floor twice since the time you are talking about. And the floors are still in deplorable condition. There are large holes in the center of the hall and something is going to have to be done about it.

Q. Tell us, to the best of your knowledge, do you know who contracted with T.C.A. to repair the floors?
A. I think his name was Tilley.
Trial transcript pp. 32-3.
Albert P. Hill, carpenter foreman for T.C.A. at the time of the trial and in 1969, was called by T.C.A. to testify relative to an inspection of the floor he made prior to the Tilley repairs in September 1969. He testified that there were holes in the floor where he could put his hand through. Questioned by T.C.A.'s attorney on the condition of the floor since that 1969 inspection, he testified:
Q. Have you had an occasion to visit 1624-26 Dryades Street since this visit of 1969 again?
A. Since that time, yes. Because I put some door frames on the second floor.
Q. Did you notice at all the condition of the first floor?
A. Since that time?
Q. Since these repairs in 1969.
A. I found the holes was in the same place as the ones before.

Trial transcript pp. 51-2.
Both West and Hill cast serious doubt on the effectiveness of the Tilley repairs in September 1969 and the fact of any consequent enrichment to Brignac. Tilley did not testify at the trial. T.C.A. had the burden of establishing Brignac's alleged enrichment, a goal it failed to accomplish. There is simply nothing in the record which would justify finding enrichment to Brignac.
*37 Inasmuch as T.C.A. has established neither a contractual right nor a quasi-contractual right to recover from Brignac, their third party claim was properly dismissed by the Court of Appeal.
For the above assigned reasons, the judgment appealed from is affirmed.
NOTES
[1] Boisdore's judgment against T.C.A., as noted earlier in this opinion, is not before us, since appeal therefrom was not properly perfected to the Court of Appeal. That judgment is final and will not now be disturbed as is the judgment, as amended, in favor of Brignac against Boisdore. Both are judgments from which writs were not sought. Bewley Furniture Company, Inc. v. Maryland Casualty, 285 So.2d 216 (La.1973); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
[2] Though we are not called upon to consider the question, it may even be argued that T.C.A.'s impoverishment is not the type of impoverishment for which de in rem verso may be used as it resulted from T.C.A.'s failure to abide by its contract, thus bringing T.C.A. within the scope of the following limitation on impoverishment.

"Although the impoverishment element is broadly defined in French law, the courts have consistently refused to allow the actio de in rem verso in situations where the plaintiff's impoverishment was the result of his fault or negligence, as well as those in which the impoverishment resulted from actions taken at this own risk." Comment, Actio De In Rem Verso in Louisiana: Minyard v. Curtis Products, Inc., 43 Tul.L. Rev. 263, 286 (1969) (footnote omitted).