629 So.2d 1278 (1993)
The BOARD OF COMMISSIONERS OF The PORT OF NEW ORLEANS,
v.
TURNER MARINE BULK, INC.
No. 93-CA-0310.
Court of Appeal of Louisiana, Fourth Circuit.
December 16, 1993.
Peter J. Butler, Richard G. Passler, Peter J. Butler, Jr., Locke Purnell Rain Harrell, New Orleans, for appellee.
J. Michael Orlesh, Jr., Gerald O. Gussoni, Jr., and Mack E. Barham, Robert E. Arceneaux, Gail N. Wise, Barham & Arceneaux, and Jerald L. Album, Suzanne Ganucheau, Abbott & Meeks, New Orleans, for appellant.
Before BYRNES, WARD and PLOTKIN, JJ.
BYRNES, Judge.
On April 5, 1991, the defendant-appellant, the Board of Commissioners of the Port of New Orleans (the "Dock Board") entered into a written lease (the "Lease") with plaintiff-appellee Turner Marine Bulk, Inc. ("Turner") for the occupancy and operation of the New Orleans Bulk Terminal. On February 17, 1992, a piece of heavy equipment integral to the operation of the bulk terminal, a shiploader, was blown into the Mississippi River during a storm and severely damaged. The shiploader is owned by the Dock Board, and is a part of the leased premises.
*1279 On March 17, 1992, after negotiations between the parties failed, Turner forwarded a letter to the Board, informing it of Turner's decision to terminate the lease "due to the collapse of the shiploader and related damage... which has rendered the terminal substantially unusable for the handling of any bulk commodities to and from vessels and rail cars." No reference is made in the letter to any economic duress asserted by the Dock Board. The notice of termination was received and accepted by the Dock Board on March 24, 1992.
Turner continued to occupy the premises, but paid no rent. On August 31, 1992 the Dock Board issued a notice to vacate the premises. On September 1, 1992 the Board sent Turner a notice of default.
On September 14, 1992, Turner filed a petition seeking enforcement of the Lease by specific performance and injunction. In conjunction with this suit, it deposited the sum of $263,060.79, representing the rents owed from February 17 through September 13, 1992 into the registry of the court.
On October 2, 1992 the Board filed a Rule to Evict Turner to regain possession of the bulk terminal.
The trial court rendered judgment in favor of Turner and against the Dock Board, dismissing the Dock Board's Rule to Evict. The Dock Board appeals. We reverse.

ECONOMIC DURESS
Turner does not dispute the fact that it sent a letter to the Dock Board dated March 17, 1992 terminating the lease. It is also not contested that subsequently Turner neither vacated the premises, nor paid rent. Turner claims that its termination letter was the result of economic duress to which it was subjected by the Dock Board. Therefore, Turner argues that it has the right to rescind its termination and enforce the Lease because of the Dock Board's economic duress.
In order to decide this issue it is necessary to explain and interpret the lease. The first paragraph of Section 26 of the Lease provides in pertinent part that:
(a) Except as provided herein, the occurrence of any loss, damage or destruction of the Leased Premises, however caused and whether covered by insurance or not, shall not be grounds for cancellation or termination of this Lease or for reduction or abatement of rent. Board shall be under no responsibility to repair, replace or restore any of the Leased Premises which may be the subject of such loss, damage or destruction, and its failure to do so shall not be grounds for cancellation of this Lease. [Emphasis added]
When read by itself, this paragraph implies that the Board could simply collect and keep insurance proceeds from a loss and refuse to make them available to Turner for repairs.
However, where that paragraph commences with the phrase "except as provided herein" it is referring to, among other things, the two immediately succeeding paragraphs which were intended to modify its meaning. The first of those paragraphs provides that:
(b) Except as provided herein, Lessee agrees that it shall at its own cost, risk and expense promptly and with due diligence repair, replace or restore any and all of the Leased premises which may become the subject of such loss, damage or destruction, however caused. Lessee shall obtain the written consent of Board to the plans for any repairs, replacements or restorations. The proceeds derived from insurance policies and amounts recovered from third parties shall be applied toward such repair, replacement or restoration. Board agrees to make such insurance proceeds and amounts recovered from third parties available to Lessee for the payment of progress payments to Lessee's suppliers and contractors working on such repair, replacement or restoration. [Emphasis added]
This paragraph clearly shifts the risk of loss to Turner and requires the Dock Board to make insurance proceeds available to Turner only for "progress payments." It does not require the Dock Board to turn insurance proceeds over to Turner when they are received by the Dock Board, or even within a reasonable time thereafter. The insurance proceeds may be advanced by the Dock *1280 Board when they are received and/or no sooner than is required to meet progress payments, whichever is later. There is no requirement that the Dock Board advance repair funds to Turner from its own funds pending the receipt of insurance proceeds. Until progress payments are due the lease requires Turner to proceed "at its own cost, risk and expense promptly."
Additionally the lease requires Turner to obtain the written consent of the Dock Board to "the plans for any repairs, replacements or restorations." Turner never submitted any such plans to the Dock Board.
The next paragraph of the Lease gives Turner the right to cancel the Lease by giving the Dock Board notice within 30 days of the occurrence of damage that renders the leased premises substantially unusable. Under such circumstances, the Dock Board would be entitled to retain all insurance proceeds paid to it and obtain from Turner any insurance proceeds which Turner might have received.
The pivotal language in the trial court's reasons for judgment is contained in the following two paragraphs:
The court finds that Turner Marine's letter of March 17, 1992, terminating the lease, was executed under economic duress and was thus voidable. LSA-C.C. Art. 1959. Shortly after the loss, Turner Marine discovered that the Board had failed to purchase insurance with a deductible of $100,000.00 as required by the lease and paid for by Turner Marine. The Board then wrongfully refused to turn over the proceeds from the insurance and wrongfully refused to pay the difference in the actual and required deductible. At this point, Turner Marine believed that it had no alternative but to terminate. Otherwise, it would have to solely bear the full cost of repairing the Shiploader which would result in its economic downfall. [Emphasis added]
* * * * * *
Finally, the Court finds that the Board is not entitled to termination of the lease due to Turner Marine's failure to repair the Shiploader. A party who prevents performance cannot take advantage of the nonperformance by the other party. By its actions, the Board has effectively prevented Turner Marine from meeting this requirement under the lease.
Whether the Dock Board was required to turn over the insurance proceeds is a matter of interpreting the lease and a question of law. The meaning of the Lease language is clear. Therefore, this Court should look no further in determine the intent of the parties. Schroeder v. Board of Sup'rs., 591 So.2d 342, 345 (La.1991). As the meaning of this lease is to be determined solely from the words upon its face without the necessity of extrinsic evidence, this Court is as competent to review the evidence as the trial court and no special deference need be accorded the trial court's findings. Id. at p. 345. This Court is not bound by the manifestly erroneous/clearly wrong standard when reviewing the Lease.[1]
Turner does not contend that it submitted any progress payments to the Dock Board that went unpaid. Turner does not contend that it did any work to repair damage that was covered by insurance for which it was not reimbursed.
Turner Marine argued strenuously that its termination of the Lease on March 17, 1992 was an action solely attributable to economic duress, because the Dock Board would not advance the funds to repair the shiploader, and/or would not commit to fund the shiploader repairs, and/or would not commit to turn over insurance proceeds to pay for the repairs. Turner Marine asserted that without such a commitment no lender would *1281 loan them the necessary funds pending receipt of the insurance proceeds in the form of progress payments. Turner contends that the Dock Board's refusal to provide economic assistance prevented Turner from receiving the funding for repairs. Finally, Turner contends that this left it without any options except to cancel the lease.
When asked why Turner did not file suit in February for breach of contract based on economic duress by the Dock Board, Turner asserted that the Lease required Turner to terminate within thirty days or commence repairs. Since Turner did not have the resources to complete repairs estimated to cost in excess of $3,000,000 it cancelled the lease. This argument is factually and legally invalid.
Turner possessed legal options other than termination of the lease. It could have filed a declaratory judgment action and/or a breach of contract suit and received timely appropriate relief. Disputes involving contract interpretation and benefits are routine issues for our courts. Turner retained experienced counsel immediately following the loss and was well aware of its legal options. Turner elected to cancel the lease, based on its financial condition and an evaluation of the lease. It cannot be said that the termination was caused by economic duress exerted by the Dock Board.
On September 14, 1992, Turner filed a petition seeking enforcement of the Lease by specific performance and injunction. Turner could have filed a similar suit prior to terminating the lease. It is inconsistent for Turner to sue for specific performance after terminating the Lease. In conjunction with this suit, it deposited the sum of $263,060.79, representing the rents owed from February 17 through September 13, 1992 into the registry of the court.
Section 19 of the Lease contains the insurance provisions which in the first paragraph required Turner to "Procure and maintain... at its sole cost and expense" property insurance based on a schedule of values which included the Shiploader valued at $3,749,727. The insurance was to be in Turner's name but any loss was to be adjusted with and payable to the Dock Board.
The next two paragraphs of Section 19 permitted Turner to request (not demand) the Dock Board to include the property Turner was obligated to insure under the Board's "wharves and sheds blanket coverage", but it was to be done at Turner's expense. It was stipulated in the lease that the Dock Board's insurance contain a $100,000 deductible. Turner's Lease required Turner to obtain $100,000 of primary property insurance to cover the Board's deductible "subject to a deductible of $5,000, for which [Turner] shall also be liable."
The Dock Board had an insurance policy with a $100,000 deductible as called for by the Lease provision just quoted, but it contained an exception upping the deductible to $1,000,000 for windstorm damage. Turner disputes the Dock Board's contention that the Dock Board represented to Turner all along that it would make up any gap in coverage from the Board's self-insurance fund and the trial judge seems to agree with Turner. However, there was no finding by the trial court that this gap in coverage was intentional on the part of the Dock Board. Indeed, it is the type of exception in an insurance policy that could have easily been overlooked, and the Dock Board appears to have been just as surprised as Turner was to discover the gap in coverage.
The purpose of the insurance was primarily to compensate the Dock Board for damage to its property, and secondarily to provide a fund for Turner to effectuate repairs. This situation is not analogous to that of the borrower who is required to escrow funds with the lender to pay for insurance on the borrower's property that serves as collateral for the loan because Turner did not own the shiploader.
As long as the funds are made available to Turner for repairs at the time called for in the Lease it makes no difference to Turner whether the funds come from an insurance policy or a self-insurance fund. The Board's witnesses testified as to the existence of a more than adequate self-insurance fund. There is no reason to doubt that testimony.
It was not economic duress under LSA-C.C. art. 1959 for the Dock Board to refuse to turn over the insurance proceeds, including *1282 the missing deductible amount, when no sums were due until there was a claim for progress payments.
Turner was obligated to commence repairs "at its own cost, risk and expense promptly." Turner was not entitled to recover any insurance proceeds until it was in a position to submit a claim for progress payments to contractors and suppliers. Any economic duress Turner experienced prior to the time it was far enough along to put in a claim for progress payments was economic duress it had agreed to when it entered into the Lease. It was not legal duress. It is not within the province of the courts to relieve parties of their bad bargains. Kenny v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386, 390 (1970).
The cases cited by Turner on economic duress are inapposite. In Wolf v. Louisiana State Racing Commission, 545 So.2d 976, 980 (La.1989), jockeys who wished to race at the Fair Grounds were required to sign an agreement waiving their right to sue the track for negligence resulting in personal injury and limit their claims to worker's compensation. The court found a vice of consent in the formation of the contract under LSA-C.C. art. 1959:
Although a threat of doing a lawful act or a threat of exercising a right does not constitute duress, a threat of doing an act that is lawful in appearance only may constitute duress. La.C.C. art. 1962. We have concluded the Fair Grounds is without authority to exclude a permittee from race participation, such authority being vested in the stewards and the racing commission. The attempt to do so is, therefore, unlawful even though clothed with the appearance of legality. While this alone may be sufficient to constitute duress, further evidence of duress includes the fact that the jockeys signed the agreement under protest, a clause to that effect having been added at the jockeys' insistence. The contract also makes clear that only jockeys who signed the agreement would be allowed access to the racetrack. Refusal to sign, then, would have barred the jockeys from practice of their livelihood. [Emphasis added] Wolf, 545 So.2d at 980.
Unlike the jockeys in Wolf Turner does not allege that he signed the Lease agreement under duress. There was no vice of consent that would void the Lease. Moreover, in Wolf the Fair Grounds was found to lack the lawful authority to act to bar any jockey from racing. Turner does not contend that there was any vice of consent in the formation of the contract.
Wright v. Sabine River Authority, 308 So.2d 402 (La.App. 3 Cir.1975), writ denied 313 So.2d 245 (La.1975), also involved a claim of duress in the formation of an agreement. However, the court in Wright refused to void the agreement:
The threats which Sabine allegedly made in this instant were threats only of doing what the party using them had a right to do, and they do not invalidate the contract. Wright, 308 So.2d at 413.
The same can be said of Southmark Properties v. Charles House Corp., 742 F.2d 862 (1984), where the court discussed the matter at some length:
... it is not duress to threaten to do what one has a legal right to do. 25 Am.Jur.2d, Duress and Undue Influence Section 18 at 375-76 (1966) (footnotes omitted).
As Professors Williston and Jaeger explain:
... This is true even though it is subsequently determined that there is no legal right to enforce the claim, provided the threat is made in good faith. ... [Emphasis added]
. . . .
"But where a threat of civil action or use of an available remedy is made only for the purposes of extortion, duress may be found." S. Williston and W. Jaeger, A Treatise on the Law of Contracts Sections 1606-07 at 672-73, 681 (3rd ed. 1970) (footnotes omitted). Southmark Properties, 742 F.2d at
Comment (b) under LSA-C.C. art. 1959 states in pertinent part that:
... [D]uress takes two forms. In one, a person physically compels conduct that appears to be a manifestation of assent by a party who has no intention of engaging in that conduct. The result of this type of *1283 duress is that the conduct is not effective to create a contract. In the other, a person makes an improper threat that induces a party who has no reasonable alternative to manifest his assent. The result of this type of duress is that the contract that is created is voidable by the victim. This latter type of duress is in practice the more common and more important. (Emphasis added.)
Thus, all those cases cited by Turner, as well as others such as Standard Coffee Service Co. v. Babin, 472 So.2d 124 (La.App. 5 Cir.1985), have certain common threads running through them which distinguish them from the instant case:
1. The argument in all of these cases is that the claimant was improperly pressured into entering into the agreement, i.e., all of these cases involve "vices of consent" in the formation of obligations. These cases are not controlling on what procedures and remedies should be employed where the claim is that a contract was terminated under duress.
2. In dealing with economic duress the "oppressor" presents the victim with a specific proposal that forces the "oppressee" to accept terms and conditions under duress.
In the instant case the Dock Board never demanded, asked, or even suggested that Turner terminate the lease. The Dock Board did not present a termination form to Turner and say "sign here, or else." In fact, it was Turner who threatened the Dock Board with termination and suggested that it would be in the best interests of the Dock Board to prevent the cancellation.
The duress of which Turner complains is qualitatively like that complained of in Wilson v. Aetna Casualty & Surety Company, 228 So.2d 229 (La.App. 3 Cir.1969). Although the facts in Wilson are very different from those alleged by Turner, this Court agrees with the description expressed by the Wilson court of what does and what does not constitute duress:
However, the contract-invalidating duress referred to is that which proceeds from a fear of force or violence which wipes out freedom of consent; it connotes an actor performing an exterior act which gives rise to the duress, rather than the entire set of objective circumstances causing the victim to act as he does. Wilson, 228 So.2d at 232.
In Wilson the court found that the oppressed party felt compelled to act as he did more because of "the entire set of circumstances causing the victim to act as he does", i.e., the "victim's" immediate, if not desperate need for cash, rather than the pressure brought to bear by the oppressor. This led the Wilson court to the same conclusion we reach in this case, to-wit:
The duress here relied upon does not constitute a Code-recognized ground to rescind a compromise. Wilson, 228 So.2d at 232.
We hold that the Dock Board did not exercise economic duress upon Turner that would justify Turner's revocation of its termination of the lease.

NOTICE OF NON-PAYMENT OF RENT
Section 40 of the lease required that all notices under the lease be given by certified or registered mail. The Dock Board sent Turner a letter by regular mail dated August 7, 1992, notifying Turner of the arrearage in rent. Turner acknowledged receipt of this letter in its reply dated August 12, 1992. The purpose of the requirement that notice be given by certified mail is to ensure receipt. City of New Orleans v. Cheramie, 509 So.2d 58 (La.App. 1 Cir.1987), writ denied, 512 So.2d 463 (La.1987). Where the party to be notified does not contest receipt, the failure to use certified mail does not invalidate the notice. Cheramie, 509 So.2d 58; See also the concurring opinion of Lemmon, J. in Wuertz v. Craig, 458 So.2d 1311, 1315 (La.1984). Where adequate notice is in fact given and its receipt is not contested, technicalities of form may be overlooked. Polizzotto v. D'Agostino, 170 La. 932, 129 So. 534, 536 (1930).
In Shepard Realty Co. v. United Shoe Stores Co., 193 La. 211, 190 So. 383, 389 (1939) the Supreme Court held that:

*1284 First, it is contended that the notice of default was improperly given being neither addressed nor mailed as required by the contract. There is no merit in this contention. The contract provided that the notice should be sent by registered mail. The letter of the lessor was not sent by registered mail, but it is admitted that it was received. The purpose of the provision in the contract that such notice should be sent by registered mail no doubt was to furnish an easy method of proving receipt. (Emphasis added.)
In Saladino v. Rault Petroleum Corp., 436 So.2d 714 (La.App. 4 Cir.1983), the plaintiff's attorney sent a notice of default for non-payment of rent by certified mail as required by the lease, but to an address other than one agreed to by the parties:
A desk clerk at the Domed Stadium Hotel signed the postal receipt ...
* * * * * *
According to Saladino, the certified letter regarding nonpayment delivered to 1111 Gravier Street was sufficient notice to The Domed Stadium Hotel, Inc. because it maintained its office there and the lease does not require notice be given to any particular person affiliated with the lessee. Saladino contends that Joseph M. Rault, Jr., president of The Domed Stadium Hotel Inc. had actual notice of the default (as evidenced by his submission of rental checks in payment of the arrearages in November, 1981), and that it would have been a "vain and useless thing" to direct a notice to the 1010 Commerce Building address where The Domed Stadium Hotel, Inc. did not maintain an office.
Although the plaintiff, Saladino, contended that proper notice was received and that the submission by the defendant of rental checks subsequent thereto seemed to provide circumstantial support for plaintiff's contention, it still remained only a contention. As distinguished from the instant case, the question of receipt was contested in the Saladino case.
The cases relied on by this Court in Saladino are also distinguishable. In Dikert v. Ruiz, 231 So.2d 633 (La.App. 4 Cir.1970), the parties argued about whether notice had ever been received. It was purely a question of fact. No requirement that the written notice be sent by certified or registered mail was involved. In Brignac v. Boisdore, 288 So.2d 31, 34 (La.1973), the court found that the lessor "never received written notice of the need for repairs nor was she afforded a reasonable time to effect the repairs" as required by the lease. There was no requirement that notice be sent by certified or registered mail in Brignac.
In Audrey Apartments v. Kornegay, 255 So.2d 792 (La.App. 4 Cir.1972) the court held that the lessees' notice of termination on June 5 was inadequate where the lease required that notice of termination be given on or before May 1. The parties were not arguing about whether notice was received, only about whether notice was received timely.
The letter from the Dock Board to Turner dated August 7, 1992 said that there were a number of areas that needed to be addressed, first among which was rent:
"1. RentTurner Marine has paid rent to the Board through February 17, 1992. Minimum base rent (including barge mooring area) due through August 31, 1992 amounts to $202,896.19. This rent is due and payable as well as any overrides, throughput, or layup charges due in accordance with Sections 4(c), 4(d), and 4(e) of the Lease." [Emphasis added].
The Lease only requires notice of non-payment. The Lease does not require that the notice of non-payment contain any special language. It need only be written. It does not require a demand for payment nor the threat that there may be consequences for non-payment; nor is there any such requirement in the law. Adam, Inc. v. Dividend, Inc., 447 So.2d 80, 82 (La.App. 4 Cir.1984). Therefore, this Court finds that the Dock Board's letter to Turner dated August 7, 1992 constituted adequate notice of non-payment of rent.

TURNER'S FAILURE TO PAY RENT
Section 25 of the lease entitled "Default" provides that a failure to pay rent for a period of thirty days after written notice has *1285 been given to the lessee shall constitute default. At the latest that thirty days would have expired on September 11, 1992, thirty days after Turner's letter of August 12, 1992 acknowledged receipt of the Dock Board letter of August 7 containing the notice of non-payment of rent. Turner's petition and deposit of funds into the registry of the Court on September 14 came too late. Therefore, this Court does not reach the question of whether Turner's deposit into the registry of the Court satisfies the requirement to pay rent.
This Court agrees with Commercial Equipment Distributors v. Anderson, 431 So.2d 29, 30 (La.App. 1 Cir.1983), where the court stated:
A lessor is bound to deliver the thing in good condition and to maintain it in a condition such as to serve the use for which it was hired. La.C.C. arts. 2692(2) and 2693). The failure of a lessor to accomplish the necessary repairs is not justification for the lessee's refusal to pay rents when due. Mullen v. Kerlec, 115 La. 783, 40 So. 46 (1905); Lassen v. Otalvaro, 391 So.2d 1378 (La.App. 4th Cir.1980). A lessee, in such a situation, has two available remedies. He may cause the repairs to be made and deduct the price from the rent due or he may sue for the cancellation of the lease. (Emphasis added) La. C.C. arts. 2694 and 2729. Houma Oil Company, Inc. v. McKey, 395 So.2d 828 (La.App. 1st Cir.), writ denied, 401 So.2d 356 (La.1981); Shear v. Castrinos, 327 So.2d 558 (La.App. 4th Cir.1976); Bruno v. Louisiana School Supply Company, Inc., 274 So.2d 710 (La.App. 4th Cir.1973). Defendant did not pursue either remedy.
The case cited by defendant, Dehan v. Youree, 161 La. 806, 109 So. 498 (1926), is not applicable; it merely gives the lessee the right to vacate the premises and seek the annulment of a lease when the thing ceases to be fit for the purpose for which it was intended.
Turner failed to pursue any of the options enumerated by the Commercial Equipment Distributors case, i.e., Turner failed to make repairs and deduct the cost from rent due; Turner failed to vacate the premises; and Turner failed to sue for the dissolution of the lease.
Therefore, assuming arguendo, that Turner's letter of March 17, 1992 terminating the lease was voidable and the lease remained in effect, it did not give him the right to remain in possession of the premises without paying rent. Turner's failure to pay rent after due notice constituted a default under the lease, giving the Dock Board the right to evict Turner independent of any such right to which the Dock Board might be entitled by virtue of Turner's letter of termination. Even where the lessor has the obligation to make repairs, this Court has denied the lessee the "self-help" remedy of withholding rent. Keever v. Knighten, 532 So.2d 826, 827 (La.App. 4 Cir.1989); writ denied, 533 So.2d 381 (La.1988). The trial court should have granted the Dock Board's rule to evict.
For the foregoing reasons the judgment of the trial court is reversed and remanded for further proceedings consistent with this decision.
REVERSED AND REMANDED.
NOTES
[1] We note that the documentary evidence and the testimony of the Dock Board's witnesses support the Dock Board's contention that it was fully cooperating with Turner, and was even willing to advance substantial funds without waiting for the delays permitted by the Lease to help Turner get started. However, as we have concluded that the Dock Board should prevail as a matter of law, it is not necessary for this Court to determine whether the trial court was manifestly erroneous/clearly wrong when it apparently elected to accept Turner's version of certain disputed facts.