638 So.2d 324 (1994)
Onyx P. GARNER, Jr., M.D.
v.
George W. HOFFMAN, M.D. (Two Cases).
Onyx P. GARNER, Jr., etc.
v.
George W. HOFFMAN, et al.
Nos. 93-CA-0155 to 93-CA-0157.
Court of Appeal of Louisiana, Fourth Circuit.
May 23, 1994.
Rehearing Denied July 19, 1994.
*326 John J. Jackson, III, Jackson and Stovall, Metairie, for plaintiff-appellant.
Marc M. Livaudais, Lecorgne, Livaudais & Baus, New Orleans, for defendant-appellee, George W. Hoffman, Individually and George W. Hoffman, M.D. (a professional Medical Corp.)
Hugh M. Wilkinson, Jr., Wilkinson & Wilkinson, New Orleans, for defendant-appellee, L. Franklyn Elliott, III, M.D.
Before BARRY, WARD and WALTZER, JJ.
BARRY, Judge.
In these consolidated appeals, George W. Hoffman, M.D., individually and on behalf of his professional corporation; Onyx P. Garner, M.D., individually and on behalf of his professional corporation; and L. Franklyn Elliott II, M.D. dispute various factual and legal conclusions reached by the district judge in litigation arising from the 1986 dissolution of their joint plastic surgery practice.

FACTS
George W. Hoffman (Dr. Hoffman), an established plastic surgeon with an academic appointment at the LSU Medical School, bought a partially erected building at 3600 St. Charles Avenue in New Orleans in 1975. The interior was designed to accommodate *327 Dr. Hoffman's practice (either solo or with up to two associates) as well as an outpatient surgical facility and medical offices for lease to physicians. The cost of the interior improvements were borne by three separate entities: Dr. Hoffman's professional medical corporation (H-Corporation) for his offices; St. Charles Avenue Surgical Facility, Inc. (SCASF) (Dr. Hoffman was the sole shareholder and officer) for the surgical facility; and Dr. Hoffman individually (doing business as St. Charles Properties) for the areas to be rented.
Dr. Hoffman individually owned most of the equipment and furnishings used in his practice and in the surgical facility, leasing them to H-Corporation and SCASF, respectively. Later Dr. Hoffman formed St. Charles Leasing, a sole proprietorship, to account for his personally-owned equipment.
In 1979 Dr. Hoffman invited one of his former LSU residents, Onyx P. Garner, Jr. (Dr. Garner) to join him as a salaried independent contractor. Shortly thereafter, Thomas F. Crais, Jr. (Dr. Crais) entered into a similar arrangement with Dr. Hoffman, and the three doctors began business as Plastic Surgery Affiliates of New Orleans (PSA). In early 1981, they contacted an attorney to prepare a partnership agreement, a task complicated by the division of Dr. Hoffman's practice and assets into the various entities.
The three doctors' joint practice continued through May 1982 when their inability to agree on financial matters resulted in Dr. Crais' abrupt departure. No written contract had been signed. Dr. Crais sued Dr. Hoffman, Dr. Garner and their corporations, and they reconvened. Significant issues in that litigation included Dr. Crais' alleged obligation to Dr. Hoffman for a management fee and rental payments for use of the building and leasehold improvements. The suit was settled in late 1986. In the interim, PSA reimbursed H-Corporation for over $20,000 in disputed expenses from funds claimed by Dr. Crais, but Dr. Hoffman executed an indemnity agreement in favor of Dr. Garner.
Discussions continued between Drs. Hoffman and Garner concerning a joint practice. Between late 1982 and mid-1983 attorney Joel Mendler provided draft contracts based mostly on information received by letter from the doctors and/or their CPAs.[1] Mr. Mendler testified that he neither negotiated terms between the two doctors nor served as adviser to either party, but translated their ideas into legal documents. During this period Dr. Hoffman's CPA, Beverly Nichols, furnished the details of her accounting and tax treatments of the practice entities to Linda Cox, Dr. Garner's CPA.
In June 1983 several contracts were executed to conclude the financial joinder of Dr. Garner with Dr. Hoffman. Primary among these was a cost-sharing agreement (the PSA Agreement) between "George W. Hoffman, M.D., a Professional Medical Corporation" (H-Corporation) and "Onyx P. Garner, M.D., a Professional Medical Corporation" (G-Corporation), which was retroactive to January 1, 1983.[2] That contract provided that each medical corporation would bill and collect for its own services, but certain expenses would be incurred under the PSA name, then apportioned and reimbursed by each party, mostly on a fifty-fifty basis; it also provided that H-Corporation was to receive a 2% management fee from G-Corporation. The agreement was for an indefinite term, but certain penalties were specified depending on circumstances if the contract was terminated prior to 1988.
An ordinary partnership known as St. Charles Leasing was formed effective January 1, 1983 through which Dr. Garner, individually, and Dr. Hoffman, individually, became equal owners of unspecified medical equipment.[3] Under the Articles of Partnership *328 the doctors had an equal voice in managing the business and neither could assign or transfer his interest without the other's consent, except pursuant to an associated Buy-Sell Agreement. In general, the latter contract provided that if one partner's conduct caused the joint practice to terminate, his partnership interest had to be sold to the other partner.
Dr. Garner, individually, also purchased an undivided 28.11% interest in Dr. Hoffman's land and building on St. Charles Avenue by an Act of Cash Sale executed in June 1983 but backdated to January 1, 1983. The 28.11% interest was calculated as one-half of the floor space occupied by the practice, both PSA (43.5%) and SCASF (12.72%). Although the property was mortgaged in favor of Greater New Orleans Homestead, the Act of Sale made no mention of that encumbrance, but the purchase price of $171,752.10 was clearly based on Dr. Hoffman's approximate net equity on January 1, 1983.[4] On Mr. Mendler's advice the Act of Sale was not recorded to avoid jeopardizing the mortgage, but Dr. Garner was given a certified copy in case he felt a need to protect his interest at a later time. The associated Buy-Sell Agreement executed the same day allowed Dr. Hoffman to repurchase Dr. Garner's interest during the first three years for the original $171,752.10 if they terminated their joint practice. After that a buy-out would be based on the current net equity value according to the parties' annual review and agreement on the total value of the property, as shown on an attachment. This Schedule shows that both Dr. Garner and Dr. Hoffman initialled their assent to the $1 million valuation as of January 1, 1983.
Dr. Garner also purchased fifty percent of the stock in SCASF from Dr. Hoffman for $8,400 cash plus a no-interest note for $119,100 due on June 7, 1986. The shares of stock were pledged to secure payment of the note, but the sale document specified that Dr. Garner retained voting rights as long as he was not in default on his note. Restrictions and conditions for any transfer of shares were set forth in a separate Buy-Sell Agreement, which included an attachment initialled by the parties showing 100% of the corporate stock was valued at $255,000 as of June 7, 1983.
Despite the financial joinder of the two doctors, there were significant differences between their practices. Dr. Hoffman, as head of the LSU program in plastic surgery, had residents available to handle most of his night and weekend calls. Other than the patients acquired through the LSU program, Dr. Hoffman primarily performed cosmetic surgery involving elective procedures that were scheduled and paid for in advance.
In contrast, Dr. Garner gained a substantial proportion of his patients through his work as an "on-call" plastic surgeon for numerous hospital emergency rooms in the Metro New Orleans area. Consequently, a significant percentage of Dr. Garner's patients had no insurance or were covered only under a government program; obtaining payment for such services involved additional collection efforts beyond preparation of insurance documentation and normal processing delays. Placement on the emergency room call lists also generally required a physician to maintain full staff privileges, necessitating Dr. Garner's attendance at monthly meetings for many of the fifteen-or-so hospitals for which he was on staff.
Partially because of Dr. Garner's busy schedule, in early 1983 the two doctors began discussions with L. Franklyn Elliott, II (Dr. Elliott) about joining their practice when he completed his residency in June 1983. Dr. Elliott had additional training in microsurgery that would add a new dimension to the practice. Pending negotiations on a five-year contract, Dr. Elliott became a salaried independent contractor for a one-year term effective July 15, 1983, to be paid by H-Corporation and G-Corporation through PSA.
Through an attorney, Dr. Elliott negotiated a five-year contract with H-Corporation *329 and G-Corporation (the Elliott Agreement) that was signed in August 1984 but was retroactive to July 1, 1983. Under the contract Dr. Elliott's collections would fund PSA's expenses which he would share on a limited basis during the first three contract years and on an equal basis thereafter. Throughout the contract Dr. Elliott would receive periodic advances on his net collections with a yearly reckoning and payment of any balance due. However, certain penalties were provided if the agreement was terminated within five years, depending on the circumstances.
The contract also specified that Dr. Elliott was to buy a one-third interest in St. Charles Leasing Partnership "as soon as possible" and that "a binding sale and purchase agreement" for one-third of the stock in SCASF was to be executed by the end of the thirty-sixth contract month. A failure of the latter condition was designated as a basis to terminate the contract.
Certain duties were also specified in the Elliott Agreement to reflect the differences between Dr. Hoffman's and Dr. Garner's practices. In addition to requiring Dr. Elliott's participation in the LSU residency program, the contract stated that "Elliott and Garner shall maintain staff privileges at the same hospitals and shall keep each other informed of all hospitals at which they maintain staff privileges.... Elliott will staff outlying medical offices with Garner. Elliott shall also participate in a mutually agreeable call schedule with Garner."
At the time Dr. Elliott joined PSA, there was only one "outlying office" for the group, located in New Orleans East (NOE office) near Methodist Hospital. Dr. Garner held regular appointments there as well as the St. Charles Avenue office he shared with Dr. Hoffman. By mid-1984 PSA was also paying for office space and/or employees shared with other doctors on both the East Bank and West Bank of Jefferson Parish (EJ and WJ offices), but only Drs. Garner and Elliott used those outlying offices. Despite a perceived inequity in this situation which was occasionally discussed with his associates, Dr. Hoffman paid one-third of the outlying office expenses through PSA. Similarly, although Dr. Elliott stopped using the NOE office shortly after the EJ and WJ offices were added, all costs of the facilities were paid by PSA and allocated equally to the three doctors.
While both the PSA and Elliott Agreements provided that Dr. Hoffman was to receive a management fee from each of his two associates, it was soon decided that an Office Manager would be hired. The Manager took charge of the day-to-day operations of the practice, guided by regularly scheduled meetings with the doctors.[5] Thus, both Dr. Garner and Dr. Elliott had input regarding office policy and procedures, but the testimony establishes that both doctors as well as the office staff deferred to Dr. Hoffman as the final authority.
With the exception of what seemed to be minor disagreements between Drs. Garner and Elliott, the group practice was functioning in mid-1985. A developer had contacted them about a planned Medical Office Building next to East Jefferson General Hospital, and each doctor put up $1,000 as an expression of interest to invest in the development. Discussions were held among the PSA physicians about moving their outlying EJ office (in a small rented space shared with non-plastic surgeons) into the planned building where they could design the interior to their needs. Because Dr. Hoffman's practice was centered in the Uptown office, he was not as enthusiastic about the project. Because he didn't see patients at the outlying offices, the prospect of paying one-third of a higher monthly expense for such a facility did not appeal to him. Dr. Hoffman's interest was in a proposal he received from St. Jude Hospital, whereby his practice and the surgical facility would be purchased and moved to that location, and he would receive certain guaranteed monthly fees. Dr. Elliott was especially interested in an expanded office in East Jefferson, as his rapidly developing *330 practice was more heavily concentrated in that area than was Dr. Garner's.
Dr. Elliott's practice was diverging from Dr. Garner's in several ways, leading to increasing tension between them. For instance, when the EJ and WJ offices were added, Dr. Garner objected to Dr. Elliott's decision to stop scheduling office hours at the NOE office and to reduce his staff privileges at some of the area hospitals, which meant he would not be on those emergency room call lists. Dr. Garner was concerned that would result in the loss of patients as well as a loss of referrals. Dr. Elliott felt that the few patients he saw in the eastern part of the City did not justify either the hours scheduled for the NOE office or the time spent attending required meetings to maintain full-staff hospital privileges. Dr. Hoffman intervened in the dispute, and Dr. Elliott reinstated his staff status at the hospitals but did not resume office hours at the NOE office.
Conflicts between Dr. Garner and Dr. Elliott arose as Dr. Elliott's microsurgical skills helped him develop referrals from other physicians, which decreased Dr. Elliott's reliance on emergency room call duty as a primary source of new patients. Since Dr. Garner maintained his focus on that type of work he felt frustration when Dr. Elliott would occasionally ask an emergency room physician to call another plastic surgeon or fail to routinely visit Dr. Garner's hospitalized patients when he was on duty.
In addition to those tensions, Dr. Elliott had not purchased his one-third interest in St. Charles Leasing. When Dr. Elliott's CPA said it was difficult to determine what equipment belonged to which entity (to assess the fairness of the price being asked) it was decided that an inventory and appraisal would be made. This was completed in October 1985, however, Dr. Elliott's CPA and his attorney had more suggestions regarding the language and terms of the proposed St. Charles Leasing Partnership agreement. Since the June 1986 deadline for the SCASF stock purchase was approaching the parties began negotiations on that contract.
Dr. Elliott's inquiries and the resultant inventory led Dr. Garner to discover facts about the various entities that had not been disclosed. One discovery was that most of the operating room equipment and furnishings belonged to Nashville Leasing, an unincorporated entity owned by Dr. Hoffman's children. It was revealed that SCASF had made equipment lease payments of $1,194.83 per month to the children since May 1982 and Dr. Hoffman had been receiving interest payments on an $80,000 note that Dr. Garner thought was interest-free.
Another problem arose in January 1986 when Dr. Garner informed his two associates that, acting on behalf of the group, he signed documents a week or so earlier to purchase a Limited Partnership interest in the East Jefferson Medical Office Building as well as a ten-year lease for office space. Dr. Hoffman and Dr. Elliott denied any agreement to such a commitment and expressed shock that Dr. Garner would proceed without their express consent. Dr. Hoffman recommended a consultation with Mr. Mendler and offered to share legal expenses that Dr. Garner would incur.
Negotiations continued in early 1986 for Dr. Elliott's purchase into St. Charles Leasing and SCASF. Dr. Elliott insisted on certification by the two partners as to which equipment was owned by St. Charles Leasing as well as a definition of "major" and "minor" assets for buy-out purposes; as to SCASF, Dr. Elliott attempted to negotiate down from Dr. Hoffman's $100,000 asking price.
On June 4, 1986 Dr. Garner informed Dr. Elliott in writing that the purchase documents for his St. Charles Leasing Partnership interest were ready and should be signed no later than June 14. On June 19, both Drs. Hoffman and Garner signed and delivered a letter to Dr. Elliott stating that unless the St. Charles Leasing contracts were executed and the full price of $24,455 paid by June 24, he would be in default of the Elliott Agreement.
Dr. Elliott was prepared on June 24 to deliver checks to both Dr. Hoffman and Dr. Garner to pay for his interest in St. Charles Leasing, but Dr. Hoffman agreed to delay payment until they completed the SCASF transaction on Monday, June 30. Although Dr. Garner testified that he did not agree to *331 the delay, on June 25 he executed all documents for the Leasing Partnership which included certification and definitions that Dr. Elliott had requested.
Although it appeared that things were back on track, on June 26, 1986 Dr. Garner delivered a termination letter to Dr. Elliott. The notice stated that the Elliott Agreement had been breached by Dr. Elliott's failure to complete the St. Charles Leasing Partnership purchase by June 25 and by his failure to adequately perform some of his specified duties under the contract.
Dr. Hoffman's attempts that weekend and throughout the next few weeks to coax Dr. Garner from his position were unsuccessful. Although Dr. Elliott paid Dr. Hoffman for his share in St. Charles Leasing and they completed the SCASF stock transfer on July 1, Dr. Garner refused to meet with them.
After June 30, 1986 Dr. Garner declared that Dr. Elliott was no longer a member of PSA. He voided the PSA check paying Dr. Elliott for his June draw, and insisted on documentation to show Dr. Elliott's share was not included before he would sign checks for routine expenses.[6] After making payment on July 2 for May's expenses, Dr. Garner refused to make further deposits to cover PSA expenses allocated to him. In July, Dr. Hoffman responded by opening a new bank account which did not require Dr. Garner's signature and, after a warning to Dr. Garner, unilaterally changed the formula for expense allocations. This litigation began on August 1, 1986.
Dr. Garner continued to see patients at PSA's office, but he hired his own employees and contracted with an independent firm to collect his accounts. By October 1986 his use of PSA employees had been greatly reduced. In the meantime Dr. Garner whited out Dr. Elliott's name from PSA stationery, and distributed Call schedules to the area hospitals indicating only Dr. Garner was available. Dr. Garner subsequently changed PSA's letterhead to substitute his new number for the phone number generally used.
On March 30, 1987 Dr. Elliott gave written notice to Dr. Hoffman that he was terminating his association and was moving to Atlanta, effective July 1, 1987. No reason was stated, but Dr. Elliott made reference to their prior discussions of such a possibility. Prior to Dr. Elliott's departure a written agreement was signed to regulate the issues between Drs. Hoffman and Elliott, including establishment of an escrow account for a percentage of Dr. Elliott's collections.
In October 1987 Dr. Garner finally removed his practice from the St. Charles Avenue office, but retained ownership in St. Charles Properties, St. Charles Leasing and SCASF.

PROCEDURAL HISTORY
Dr. Garner filed two suits on August 1, 1986: in the first he sued Dr. Hoffman for rescission of the SCASF stock purchase; in the second, Dr. Garner and G-Corporation sued Dr. Hoffman, H-Corporation and Dr. Elliott for damages resulting from their alleged breach of the Elliott and PSA Agreements. Answers, reconventional demands and cross-claims followed.
On March 20, 1987 Dr. Garner filed a third suit, asserting among other things that Dr. Hoffman had improperly charged him for 28.11% of the mortgage payments on the St. Charles Avenue building, even though Dr. Garner was not liable on the mortgage. Restitution, an accounting and injunctive relief were sought. Numerous amendments and reconventional demands were added and all three suits were consolidated and assigned to a commissioner for trial.
Testimony and evidence were taken on twenty-five days in early 1990, followed by post-trial memos. The Commissioner's recommended judgment and reasons were rendered August 14, 1990. All parties filed exceptions to the Commissioner's report, and twenty-four of the twenty-five days of testimony were transcribed for the trial judge's consideration.
The trial court's judgment was rendered on June 23, 1992, accompanied by written reasons stating disagreement with most of the Commissioner's findings. All parties *332 sought a new trial, with Dr. Garner basing his request in part on the fact that one day of testimony had not been transcribed. These motions were denied October 5, 1992.
Dr. Garner and G-Corporation have appealed all three suits, asserting:
1. G-Corporation should be awarded Dr. Elliott's collections and receivables as of June 30, 1986, since Dr. Elliott breached the Elliott Agreement;
2. Dr. Hoffman's mismanagement of the practice entitles G-Corporation to damages and a refund of management fees;
3. Certain expenses were improperly charged to G-Corporation under the PSA Agreement, for which reimbursement is owed;
4. Dr. Garner should not have been charged for loan payments on the St. Charles Avenue building because he did not assume the mortgage, and he is entitled to reimbursement or rescission of the sale;
5. Dr. Garner is entitled to rescission of his stock purchase in SCASF due to Dr. Hoffman's deceit and self-dealing;
6. Dr. Hoffman breached the St. Charles Leasing Buy-Sell Agreement, entitling Dr. Garner to damages and attorney fees;
7. Drs. Hoffman and Elliott each owe Dr. Garner one-third of the expenses in connection with the East Jefferson Medical Office Building, since he acted as agent for their partnership.
Dr. Elliott answered the appeal, arguing only that Dr. Garner and G-Corporation owe him $41,694.49 in net collections from PSA as of June 30, 1986.
Dr. Hoffman and H-Corporation answered, contending:
1. Dr. Garner and G-Corporation owe $125,525.79 in expenses through October 1987 plus $10,000 liquidated damages under the PSA Agreement;
2. They are entitled to damages of $1.3 million for Dr. Garner's breach of the Elliott and PSA Agreements;
3. Dr. Garner should not have been awarded $3,333.33 as reimbursement for implants purchased by PSA;
4. Dr. Garner's breach of the St. Charles Leasing Partnership entitles Dr. Hoffman to specific performance, damages and attorney fees under the Buy-Sell Agreement.[7]

STANDARD OF REVIEW
Although this case was tried before a Commissioner pursuant to La.R.S. 13:1171, the district judge's determination of the facts based upon review of documentary evidence and transcripts is subject to the manifest error standard. Alexander v. Pellerin Marble & Granite, 630 So.2d 706 (La.1994); Mintz v. Jefferson Insurance Co., 537 So.2d 1241 (La.App. 4th Cir.1989). But where contractual language is clear and no extrinsic evidence is necessary for interpretation, no special deference is accorded the trial court's findings. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991); Board of Commissioners, Port of New Orleans v. Turner Marine Bulk, Inc., 629 So.2d 1278 (La.App. 4th Cir.1993), writ den., 634 So.2d 392 (La.1994).
The trial court did not have a transcript of the testimony taken on January 22, 1990 which contained evidence regarding Dr. Hoffman's alleged breach of his management duties under the PSA Agreement.[8] Although a trial judge's failure to review the full transcript has been held to require a remand under R.S. 13:1171(G), State Department of Transportation & Development v. Willard E. Robertson Corp., 542 So.2d 698 (La.App. 4th Cir.1989), because the missing testimony was only one day out of twenty-five and the record is now complete, this *333 Court will make a de novo review and determination on this issue in the interest of judicial economy. McLean v. Hunter, 495 So.2d 1298 (La.1986).

THE ELLIOTT AGREEMENT
Dr. Garner disputes the determination that Dr. Elliott had not forfeited his receivables by failing to adequately perform his duties under this contract. However, the evidence fully supports the conclusion that none of Dr. Garner's complaints in his termination letter of June 26, 1986 represented a material breach of the Elliott Agreement.
Dr. Garner claimed that Dr. Elliott failed to meet the deadline for his purchase of an interest in St. Charles Leasing Partnership. Since the contract only required that this transaction occur "as soon as possible," it was Dr. Garner's burden to show that time was of the essence and that he was damaged by the delay.
There was no evidence that Dr. Elliott's negotiations were in bad faith or were designed to delay the transaction; his investigation and desire for specifications in the purchase-sale documents were those of a prudent investor and were recommended by his financial and legal advisors.
Even when June 24, 1986 was set for payment and execution of documents, Dr. Elliott's reasonable request for a six-day delay for payment was granted by Dr. Hoffman. Dr. Garner's claim that he did not agree to the extension is inconsistent with the evidence that on June 24 Dr. Elliott had a check prepared for delivery to Dr. Garner if he insisted on payment, and that Dr. Garner signed all necessary documents on June 25. Despite the termination letter of June 26, 1986 Dr. Hoffman and Dr. Elliott tried to meet with Dr. Garner on June 30 and July 1 but were rebuffed.
Dr. Garner therefore failed to prove that any delay in the St. Charles Leasing Partnership purchase was material to the parties' obligations under the Elliott Agreement.
Dr. Garner also claimed that Dr. Elliott failed to fulfill his obligations to maintain hospital privileges, to staff outlying offices, and to participate in a mutually agreeable call schedule with Dr. Garner. Dr. Garner's testimony establishes that he viewed Dr. Elliott's role to be that of an assistant, tied throughout the five-year contract term to Dr. Garner's type and geographic area of practice. But as the trial court found, this view is based on a narrow interpretation of the contractual language that is not supported by evidence of the parties' intent.
Dr. Elliott concedes that beginning in mid-1985, he exercised his judgment regarding which outlying offices and hospitals to staff and at what level, and that it was apparent that he and Dr. Garner held different views regarding aspects of patient care. But as Dr. Hoffman testified, and as shown by the structure and tenor of the contract, it was intended that Dr. Elliott would develop into an independent practitioner and equal colleague rather than remain an associate.
Additionally, it was shown that most of those issues, such as the use of outlying offices and hospital staff privileges, arose in 1985 and were resolved at that time. Further disputes regarding Dr. Elliott's obligations when on night and weekend call were dealt with at a meeting in January 1986. Although Dr. Garner was not entirely satisfied with resolution of the issues, he continued negotiations to further integrate Dr. Elliott into the practice. Thus, Dr. Garner's contention that these "failures" were material breaches of the Elliott Agreement is inconsistent with his conduct.
Since Dr. Garner did not prove that Dr. Elliott breached his contract, the claim for a portion of Dr. Elliott's receivables was properly denied.
Dr. Hoffman argues that the trial court's finding that Dr. Elliott had not breached the Elliott Agreement requires the conclusion that Dr. Garner's attempted termination of the association was an actionable breach, entitling Dr. Hoffman to resultant damages. He asserts that the contractual language establishes Drs. Hoffman and Garner as joint and indivisible obligees, mutually bound until both agreed to dissolve their relationship with Dr. Elliott. We find no error in the trial court's rejection of this argument.
*334 The Elliott Agreement provides for several circumstances under which the association could be terminated, including Dr. Elliott's or Dr. Hoffman's death or disability or Dr. Hoffman's retirement.[9] In addition, if Dr. Elliott terminates the agreement for reasons other than death or disability, penalties are outlined depending upon when it occurs and where he subsequently practices. It is also stated:
9. Termination of Association: .... (c) If Hoffman and Garner terminate Elliott's association ... for reasons other than involving moral turpitude or failure to adequately perform the duties outlined ... Elliott shall be entitled to receive all of the receivables, and all collections less expenses thereon ... less only 20% thereof for the overhead of collection.
* * * * * *
16. Termination: This Agreement may be terminated by Elliott, on the one hand, or Hoffman and Garner, on the other hand, upon ninety (90) days advance written notice to the other party.
Dr. Hoffman contends that these provisions represent a clear and explicit expression of the parties' intent to limit the decision to terminate the Agreement to either Dr. Elliott or to Drs. Hoffman and Garner, and is not subject to further interpretation. We agree that the Elliott Agreement requires the mutual consent of Drs. Hoffman and Garner to disassociate Dr. Elliott as an independent contractor paid through the PSA cost sharing arrangement. However, nothing in the Elliott Agreement prevents Dr. Garner from terminating his individual association with the medical practices of the other physicians or PSA and thus withdrawing from the Elliott Agreement. To rule otherwise would lead to the absurd result that neither Dr. Garner nor Dr. Hoffman could independently withdraw from the practice prior to 1988 under the terms of the PSA Agreement, which is repeatedly referenced in the Elliott Agreement.
Words in a contract which are susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. LSA-C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. art. 2050. Under Civil Code article 2054, the nature and purpose of the contract must be considered in determining the parties' implied intent under these circumstances.
The Elliott Agreement controls the employment of Dr. Elliott. It is akin to an employment agreement[10] and specifically allows Dr. Elliott to withdraw at will [paragraph 9(a) and (b)]. Dr. Garner, who had the right to terminate the PSA cost sharing arrangement, must have an equal right to withdraw which is implied in the contract. Also, one of the stated reasons for bringing Dr. Elliott in over a 5-year phase-in period was that each physician could decide if he wanted to practice with the others. It thus must be implied that Dr. Garner had the right under this contract to determine, independently of Dr. Hoffman, whether he wished to continue practicing medicine in association with Drs. Hoffman and Elliott.
While the Agreement specifies that Dr. Elliott would suffer a penalty if he withdrew for such "personal" reasons, Dr. Hoffman and Mr. Mendler both testified that was a common provision when a young physician joined an older doctor with an established practice. It is intended to discourage the younger physician from "stealing" patients and building up income, then suddenly departing. Since Dr. Garner did not occupy that position under the Elliott Agreement, an "equal" penalty provision for Dr. Garner's at-will withdrawal need not be implied.
Because the Elliott Agreement required the mutual consent of Drs. Hoffman and Garner to disassociate Dr. Elliott, Dr. Garner's attempted unilateral termination of the Elliott Agreement effectuated, at most, Dr. Garner's withdrawal. Further, when Dr. *335 Garner terminated the PSA Agreement he had the implied right to withdraw from the Elliott Agreement.[11]
Even if Dr. Elliott's conduct was not a material breach which would trigger a contractual penalty in terms of lost receivables, that does not require a finding that Dr. Garner's termination, in and of itself, was an actionable breach. Instead, we find that Dr. Garner had an implied right under the Agreement to decide that he no longer wished to maintain his association with Dr. Elliott, and to withdraw from the contract on that basis independently of Dr. Hoffman's wishes.
Therefore, the trial court did not err by denying Dr. Hoffman's claim for damages.
There is no basis for an award of damages against Dr. Garner in favor of Dr. Hoffman, either express or implied, in the Elliott Agreement. Dr. Hoffman claims he is entitled to recover the additional expenses he had to pay when Dr. Elliott ceased contributing in July 1987. But while the contract had a stated term of five years, Dr. Elliott could have decided to leave at anytime and would have only forfeited a percentage of his receivables, not incurred liability to Dr. Hoffman for damages. Additionally, Dr. Elliott's decision to leave was a personal decision not to "weather the storm," not a required consequence of Dr. Garner's termination: "When a contract has been made by more than two parties, one party's failure to perform may not cause dissolution of the contract for the other parties, unless the performance that failed was essential to the contract." La.C.C. art. 2020.
Dr. Elliott's only claim on appeal is that the trial court erroneously rejected an award against Dr. Garner of $41,694.49, representing the remainder of Dr. Elliott's net collections when he was notified that the Elliott Agreement was terminated at the end of June 1986. In support of this contention it is pointed out that judgment was granted against Dr. Hoffman and H-Corporation for $3,652.35, which was stipulated as the amount that remained unpaid of Dr. Hoffman's share of those collections. However, since the latter award is not challenged on appeal, this Court need not address Dr. Elliott's claim of inconsistency.[12]
Paragraph 9(c) of the Elliott Agreement states that if Drs. Hoffman and Garner terminate Dr. Elliott's association, he is entitled to all of his receivables and collections, less expenses. Since he was owed $86,065.58 in net collections as of June 30, 1986, and the CPA testified that Dr. Garner's portion of that amount was $41,694.49, Dr. Elliott argues the trial court's denial of his claim was manifestly erroneous.
There is a clarity and simplicity to Dr. Elliott's argument which is especially attractive in the face of the financial complexities of this case. However, it ignores the fact that although Dr. Garner declared that the Elliott Agreement was dissolved, no termination of the joint accounting for Dr. Elliott's collections and the PSA expenses actually occurred at that time. PSA was merely an accounting method, not an entity or even a particular bank account.
The monthly accounting statements provided details regarding the doctors' respective shares of expenses and Dr. Elliott's collections, but neither of the two contracts linking the doctors' practices intended a monthly settlement to bring everyone to a zero balance. Thus, although the PSA statement for June 30, 1986 showed Dr. Elliott had a positive balance of $86,065.58, that amount was adjusted through the ensuing months by adding his subsequent collections and subtracting his share of expenses. A painstaking review of the actual accounting statements through December 31, 1988 shows that after June 1986 Dr. Hoffman and H-Corporation retained control of the PSA funds. When Dr. Elliott left in July *336 1987 he reached a separate agreement with Dr. Hoffman and H-Corporation concerning the distribution of that money; the existence of this litigation led the two to set up an escrow account to which Dr. Garner had no access.
Furthermore, there is no allegation that, either before or after July 1986, Dr. Garner withdrew funds to which he was not entitled or signed checks on the PSA bank account to pay any unauthorized expenses. Therefore, neither Dr. Garner nor G-Corporation received any portion of Dr. Elliott's June 1986 net collections. While it is claimed that G-Corporation failed to pay its share of expenses for June 1986 forward, implying that Dr. Elliott's funds were used for this purpose to some extent, only Dr. Hoffman and H-Corporation are pressing a claim for reimbursement. It must be assumed that any claim Dr. Elliott had in this regard was included within his settlement with Dr. Hoffman.
Therefore, Dr. Elliott failed to prove that he either suffered a loss of $41,694.49 or that Dr. Garner or G-Corporation was unjustly enriched in this amount, and the trial court properly rejected this claim.[13]

THE PSA AGREEMENT
Dr. Hoffman and H-Corporation assert that since Dr. Garner remained on PSA's premises until October 1987, reimbursement is owed from Dr. Garner and from G-Corporation for a share of the PSA expenses which totals $125,525.79.
Dr. Garner and G-Corporation argue no reimbursement is due because the PSA Agreement was terminated in July 1986 because of Dr. Hoffman's conduct. He also contends that pursuant to Dr. Hoffman's instructions, the only thing he was allowed to share with Dr. Hoffman and Dr. Elliott after October 1986 was office space, and as an owner of the building he was entitled to rent-free, as recognized by the trial court's grant of injunctive relief. Finally, it is pointed out that the amount claimed to be due includes charges which Dr. Hoffman admits were not actually paid after Dr. Elliott left, such as equipment rents to St. Charles Leasing, as well as 1986-87 management fees which were not earned because Dr. Hoffman was no longer managing the joint practice.
The trial court rejected reimbursement without explanation. We find that the failure to award any expense was manifestly erroneous under the PSA Agreement which states:
This Agreement shall be effective from the date hereof until the parties mutually decide to terminate the Agreement or until either party gives the other party ninety (90) days prior written notice of its intention to terminate the Agreement.
* * * * * *
If Garner (Corporation) voluntarily and unilaterally terminates this Agreement prior to 1988 ... Garner (Corporation) shall pay Hoffman (Corporation) the sum of $10,000.00 in full satisfaction of any residual overhead and operating costs incurred by Hoffman after the effective date of Garner's termination, regardless of whether actual residual overhead and operating costs exceed or are less than the stipulated dollar amount.
These provisions contemplate a period during which the parties could wind-down their joint operations, either by agreeing on a date for termination or by furnishing the required notice. Thus, Dr. Garner's apparent attempt to effect an immediate dissolution violated the provision and intent of the contract. However, Dr. Hoffman's position, that termination did not occur until October 1987 since neither of the two explicitly stated (or wrote) "I am terminating our Cost-Sharing Agreement," is at odds with the facts shown at trial.
After Dr. Garner delivered the June 26 termination letter to Dr. Elliott, in the early part of July Dr. Hoffman made several written and verbal attempts to salvage the relationships. Similarly, Dr. Garner only insisted that Dr. Elliott's affiliation with the group had ended, but the cost-sharing arrangement could continue between H-Corporation and G-Corporation. However, both Dr. Hoffman and Dr. Garner thereafter took actions which *337 were contrary to the letter and spirit of their contract and detrimental to any continued relationship. Dr. Garner refused to sign checks to pay legitimate practice expenses and he deleted Dr. Elliott's name from stationery and call schedules. Dr. Hoffman responded by opening a new bank account, instructing the PSA employees not to perform services for Dr. Garner and changing the formula for expense allocations retroactively.[14]
Additionally, both parties provided written notice in July 1986 that due to the other's actions the PSA Agreement no longer regulated their relationship.[15] Unless otherwise specified, a contractual requirement of written notice does not demand explicit wording in conformity with the language of the agreement. Turner Marine Bulk, Inc., 629 So.2d at 1284. Finally, even if Dr. Garner's intent to terminate the association was not made clear by his conduct and letters, the filing of suit on August 1, 1986 was sufficient written notice as contemplated by the contract.
We therefore find that notice of termination of the PSA Agreement was given in July 1986 and, in conformity with the language and intent of the contract, the joint practice was dissolved ninety days later at the end of October 1986. G-Corporation therefore owes H-Corporation $57,635.76[16] in expenses incurred through that date.
While the claim for additional expenses after October 1986 was properly denied, it was error to reject the award of liquidated damages. The PSA Agreement specifies that if Dr. Garner ended the association prior to 1988, his corporation would owe "$10,000 in full satisfaction of any residual overhead and operating costs ... regardless of whether actual residual overhead and operating costs exceed or are less than" this amount.
Furthermore, the evidence supports Dr. Garner's contention that after October 1986, there were few if any actual expenses incurred by PSA on his behalf. Dr. Hoffman had instructed the office staff not to assist Dr. Garner in any way; Dr. Garner had to have his own phone line installed; an independent firm was doing Dr. Garner's billings and collections. Therefore, those expenses allocated to G-Corporation on the PSA accounting statements after October 1986 are properly seen as "residual overhead and operating costs" as specified in the contract. H-Corporation therefore should have been awarded $10,000 in liquidated damages in addition to reimbursement of the expenses discussed.
Dr. Hoffman and H-Corporation argue that a judgment should be rendered against Dr. Garner individually and against his corporation, because Dr. Garner treated G-Corporation as his "alter ego." This argument is not supported by the record. It is true that Dr. Garner, like Dr. Hoffman, often spoke as though he and his corporation were indistinguishable under the contracts at issue. However, examination of all documents and financial records reflect a clear separation between the corporate entity and Dr. Garner's personal assets, liabilities and obligations. There is nothing to suggest funds were commingled or corporate formalities were ignored. And since the PSA Agreement was only between H-Corporation and G-Corporation, there is no basis for Dr. Garner to be personally liable.
Dr. Hoffman contends that in addition to the expense reimbursement discussed above, he is entitled to recover income lost because of Dr. Garner's breach of the PSA Agreement. This claim is said to arise from *338 the fact that there was no longer another physician sharing the practice expenses and because Dr. Garner's conduct disrupted the practice, decreasing productivity by Dr. Hoffman and the PSA staff. Since Dr. Hoffman did not bear his burden of proving either his entitlement to such damages nor the amount, this claim was properly rejected by the trial court.
The PSA Agreement was clearly terminable at the will of either party, conditioned only on proper advance notice. Additionally, the parties specified that if Dr. Garner withdrew prior to 1988 G-Corporation would owe liquidated damages of $10,000. This specification of when damages would be payable and in what amount indicates that the parties intended a rejection of additional damage claims. Furthermore, the contract's indefinite term does not mean that Dr. Hoffman was in any way guaranteed an associate until retirement; his increased expenses are a natural consequence of the end to the cost-sharing, not a harm resulting from a breach. To the extent Dr. Hoffman seeks damages for nonpecuniary harm, the claim was properly rejected under La.C.C. art. 1998 since the parties were clearly seeking only to maximize income, not to satisfy any other interests.
The evidence of the fact and amount of the claimed losses was also insufficient. Although Dr. Hoffman testified that Dr. Garner's conduct prevented him from devoting as much time to patient care and disrupted office operations, it was shown that his income had been declining prior to 1986, for reasons unrelated to the disputes with Dr. Garner. Since nothing was offered to establish an actual decrease in patient visits or an increase in the time he spent overseeing office activities, Dr. Hoffman failed to carry his burden of proof.
In another claim arising under the PSA Agreement, Dr. Hoffman contends the trial court's award of $3,333.33 to Dr. Garner as reimbursement for PSA's purchase of breast implants was error. We agree.
The evidence clearly shows that PSA paid H-Corporation $9813.65 in 1984 to acquire an inventory of implants and each doctor reimbursed PSA as an implant was used. As of June 30, 1986 there were implants worth $4850.45 in stock, and in August 1986 H-Corporation bought them back from PSA. Dr. Garner's claim is premised on the reimbursement being deposited into the new bank account opened in July 1986 instead of into the PSA account over which he had joint control.
However, (as discussed earlier), PSA was an accounting method, not an entity. Although each month's accounting statement lists assets such as cash, funds in the bank and the inventory of implants, analysis shows that the value of the assets equals the amount by which Dr. Elliott's net collections exceed the expenses owed by the other two doctors' corporations. At any given point these "assets" would have to be liquidated to pay Dr. Elliott the balance due him, even if H-Corporation and G-Corporation had deposited enough funds to cover their obligations.
Therefore, neither Dr. Garner nor G-Corporation had any right to a share of the implants or the amount paid for them, regardless of which PSA bank account received the later reimbursement.[17] The award of $3,333.33 was erroneous and is reversed.
Dr. Garner claims that he should be awarded damages and that the management fees he paid to Dr. Hoffman under the PSA Agreement should be returned because Dr. Hoffman failed to ensure that Dr. Garner's accounts receivable were timely and properly collected. On our de novo review of this claim, we find that Dr. Garner did not carry his burden of proof.
The evidence, taken as a whole, shows that Dr. Garner's accounts were at least given equal treatment by the collection clerks. In fact, minutes of the periodic business meetings indicate an extra emphasis was placed on his collections throughout 1984 and 1985, with one employee instructed to spend 90% of her time working on Dr. Garner's accounts. *339 In addition, a time study conducted in May 1986 by the office manager shows that in general, 3.01 employees were devoted to performing services for G-Corporation, 2.35 for Dr. Elliott, and 2.24 employees for H-Corporation.
Nor does the testimony of Denorah Jones Aversa, which was not transcribed for the district court's review, support the allegations of mismanagement, as Dr. Garner strenuously argues. This former PSA collections clerk stated that she input initial billing data for all patients as it was furnished. At the beginning of each month, she gave each of the doctors a printout of all "aged" accounts (over 60 days, over 90 days, over 120 days) then waited for them to schedule time with her to discuss further processing. This conference was necessary because only the treating physician could determine whether an outstanding bill was to be written off or whether further collection efforts would be productive, such as by appealing an insurer's denial or by pressing the issue with the patient. While Dr. Hoffman always promptly met with Ms. Aversa to review each and every account, and Dr. Elliott sometimes conferred with her, Dr. Garner's routine practice was to merely return the printout to her, with his handwritten notes in the margins. After receiving the doctors' instructions, she then worked the accounts in no particular order; since she was collecting for four different entities (the three doctors and SCASF), she tried to devote one week of each month to each. In practice, Dr. Hoffman's accounts were usually done first and Dr. Garner's the last part of the month.
Dr. Garner relies on this witness' testimony to support his allegations that his accounts were generally neglected and that, beginning in April 1986, were ignored altogether. We do not find this to be the case. While Ms. Aversa testified that the office manager was aware that G-Corporation's collection rate increased when she was able to devote extra time to them, this does not establish a pattern of neglect; this would be true for any of the doctor's collections, and the evidence shows that, in fact, Dr. Garner's aged accounts had frequently been given top priority at numerous office meetings. And although Ms. Aversa stated that they had stopped issuing collection letters in about April 1986, she did not testify, as Dr. Garner argues, that she was deliberately instructed to ignore his collections at this point in time.[18] Instead, her testimony indicates there was a problem with the computer-generated messages on the collection letters that caused an excessive number of phone calls from the patients, resulting in the decision to stop using that program. Thus, Dr. Garner's allegations of deliberate mismanagement were not proven.
Furthermore, Dr. Garner failed to establish that any difference in his collection ratios from that of his associates was not due to factors other than the processing methods used.[19] Dr. Garner generally took longer to review and sign the initial insurance claim forms and billing statements for his patients. He had a greater number of patients and a greater proportion of them had no insurance. Although Dr. Elliott had a slightly greater percentage of Medicare/Medicaid patients, Dr. Garner was more reluctant to accept a denial or payment limitation on these claims, choosing instead to resubmit with different coding or to pursue administrative appeals. Dr. Garner was also more reluctant to write off old accounts. On this evidence, it is reasonable to conclude that Dr. Garner's collection ratio was slightly lower than that of his associates because Dr. Garner carried the full billing amount on his books for a longer time than others chose to do.
*340 Since we find that Dr. Garner and G-Corporation did not prove any loss was caused by mismanagement, we need not address the issue of responsibility for collections under the contractual language.
Another claim arising from the PSA Agreement is for reimbursement to G-Corporation of $1,318.38 for accounting fees paid through PSA for services rendered in connection with Dr. Crais' lawsuit. Dr. Garner contends that since he was only a nominal defendant in that suit and since Dr. Hoffman executed an indemnification agreement relating to Dr. Crais' claims, the $2,636.76 total charged was not a joint expense payable through PSA and he should be refunded one-half of the amount.
This claim was properly rejected by the trial court as totally without merit. The judgment and written reasons rendered in Dr. Crais' suit, admitted into evidence at this trial, show that Dr. Garner joined Dr. Hoffman in asserting that a partnership had existed between the three doctors which obligated Dr. Crais to make certain payments. While Dr. Crais sued to obtain reimbursement for some of these, Drs. Hoffman and Garner countered with reconventional demands for certain other amounts allegedly still due. Although the resultant judgment cast Dr. Hoffman for a greater portion of the sums found to be owed to Dr. Crais, and in fact awarded Dr. Garner just over $400 on one of his claims, it cannot be said that Dr. Garner was merely a nominal defendant in light of the mutual defense of a partnership presented by Drs. Hoffman and Garner.
The reliance placed upon the Hold Harmless and Indemnity Agreement is similarly misplaced. That document recites the circumstances of the Crais dispute, and the fact that Dr. Hoffman claims a portion of certain funds being retained by PSA which belong to Dr. Crais. It then states:
NOW, THEREFORE, the parties agree as follows:
1. (PSA) shall reimburse Hoffman in the amount of $20,194.20 from the retainage held for Crais for amounts owed by Crais to Hoffman.
2. Hoffman agrees to hold Garner harmless and indemnify Garner from all liability of any nature or kind arising out of a claim by Crais for the amounts paid to Hoffman in repayment of Crais' debt to Hoffman....
We find no ambiguity in this agreement, which relates only to the particular payment made by PSA to Hoffman; nothing in the language suggests that Dr. Hoffman was agreeing to bear all expenses of the Crais litigation. Even if parol evidence were admissible as to the intent of the parties, both Dr. Hoffman and Mr. Mendler denied that there were any discussions beyond indemnification for this one claim, as confirmed by Mr. Mendler's notes. Since Dr. Garner presented no evidence that the accounting fees at issue related to the $20,194.20 payment, the trial court properly rejected this claim.
Dr. Garner also seeks a declaratory judgment that he is not liable for any of the attorney fees incurred in connection with the Crais litigation, relying upon the same arguments as above. However, those fees were not paid by PSA and are at issue in a separate suit brought by Mr. Mendler's law firm against Dr. Garner and G-Corporation. We therefore decline to render a judgment in this action regarding those fees.
G-Corporation also claims $444.00 in interest is due under the PSA Agreement because H-Corporation did not promptly deposit its share of expenses from November 1985 through June 1986. This Court finds no error in the trial court's denial of this claim.
Nothing in the contract specifies that deposits to cover apportioned expenses are to be made on any set schedule. Dr. Hoffman, Dr. Elliott and Ms. Nichols, whose CPA firm kept the PSA accounts, testified that both H-Corporation and G-Corporation had traditionally just made "round-figure" deposits on an as-needed basis to keep the PSA bank account from being depleted. It was not until October or November 1985 that an interest-bearing account was even opened for PSA. Therefore, based on the language of the Agreement as well as the course of conduct of the parties, the trial court could reasonably conclude that H-Corporation did *341 not breach any contractual duty in this regard.

ST. CHARLES PROPERTIES
Dr. Garner contends that he is entitled to a refund of all mortgage payments deducted from his share of the rents for this building, since there is no mention of any mortgage in the Act of Sale nor did he sign an Act of Assumption prepared later when this oversight was discovered. He also seeks a declaratory judgment that he is not liable for any future share of the loan payments. In the alternative he seeks rescission of the sale, claiming unilateral error.
Although Dr. Garner did not assume the mortgage encumbering this property, this merely means that the creditor-mortgagee could not hold Dr. Garner personally liable for repayment of the underlying loan. See Leisure Villa Investors v. Life & Casualty Insurance Company of Tennessee, 527 So.2d 520, 523 (La.App. 3rd Cir.1988), writ den., 532 So.2d 157 (La.1988) [Court recognized that one who assumes a mortgage becomes personally liable on the obligation secured by the mortgage, but one who purchases property subject to a mortgage incurs no personal liability]. Since the mortgage pre-dated his purchase and was properly recorded, default on the loan would result in the seizure of the entire property, including Dr. Garner's 28.11%. Therefore, the lack of a written mortgage assumption does not resolve the issue in this case.
Instead, the question presented is whether Dr. Garner agreed when he bought an interest in the property that he would also bear a proportionate share of the debt that was secured by the mortgage. Such an agreement is neither a mortgage assumption nor a promise to pay the debt of another, which would require a writing; it is merely a two-party contract that must be proved in accordance with La.C.C. art. 1846. Such an agreement was proven here.
Dr. Garner approached Dr. Hoffman about purchasing an interest in the building in 1981 because he wanted a return on the rent being paid through PSA. The evidence establishes that although Dr. Hoffman discussed various prices and structuring of such a sale with his CPA, he decided at that point that any associate could buy an equity interest, and thus share in the net income, by paying a proportion of $1 million less the outstanding principal due on the mortgage loan.[20]
This "formula" is reflected in Mr. Mendler's earliest notes of his meetings with Drs. Hoffman and Garner, and he recalls that it was only the percentage being purchased that changed between the earliest discussions and the final transaction, previously detailed in the factual summary of this opinion. Dr. Hoffman and Ms. Nichols, his CPA, also testified that these details were discussed with Dr. Garner and his CPA, Linda Cox, well in advance of the actual sale. Ms. Cox did not recall receiving any information on the transaction prior to October 1983 when she spoke to Ms. Nichols, but could not deny that she attended the meetings or received the documents reflected in Mr. Mendler's records.
Dr. Garner admits he was aware of the mortgage prior to his purchase, but now claims he was unaware that his purchase price was based in any way upon either a $1 million valuation or the principal balance of the loan, or that the transaction would give him only an equity interest in the property. However, in the face of the evidence outlined above, the trial court could reasonably conclude that this testimony was incredible, since everyone else involved in the transaction had a clear understanding of all details. In addition, Dr. Garner expressly assented to the $1 million property valuation as of January 1, 1983 when he executed the related Buy-Sell Agreement at the same time he signed the Act of Sale.
Once it is determined that Dr. Garner must have been aware of the basis for the purchase price and the precise nature of the transaction, it is reasonable to infer that he agreed to share the debt repayment with Dr. *342 Hoffman, especially since his interest was subject to seizure if the loan were not repaid. Each year he was furnished a detailed statement of the building's total revenues and expenses along with a check for his share of the net income. These statements included the calculations of 28.11% of each expense, including principal and interest paid on the mortgage loan. Dr. Garner accepted the payments and reported the income on his tax returns, taking a deduction for 28.11% of the mortgage interest, for 1983 through 1986 without complaint or protest that his share was improperly reduced.
Considering that Dr. Garner's interest in the building was subject to seizure if the mortgage loan were not repaid, his course of conduct can thus be seen as evidence of his agreement to share the expenses of the building, including repayment of this debt, in the same proportion as he shared the income with Dr. Hoffman. Therefore, denial of the claim for a refund of the loan payments was not manifestly erroneous.
Similarly, Dr. Garner did not establish that he is entitled to rescission of the sale on the grounds of error. He admitted that his primary motivation for acquiring an interest in the building was to obtain a return on the payments G-Corporation was making through PSA. Since it was shown that Dr. Garner received both income and tax deductions from this investment, there was no failure of "cause" as required for rescission under La.C.C. art. 1949.

ST. CHARLES AVENUE SURGICAL FACILITY, INC.
Dr. Garner argues that he is entitled to rescind his purchase of stock in this corporation because he was induced to enter into the transaction by Dr. Hoffman's fraud and deceit, and because the stock was rendered worthless by Dr. Hoffman's self-dealing. On the evidence presented, the trial court correctly concluded that Dr. Garner failed to prove any fraud or self-dealing which would entitle him to rescission.
Dr. Garner's primary allegation of fraud concerns the equipment used in the surgical facility. He testified that although he had assumed at the time of his stock purchase that SCASF owned all the equipment, he learned in late 1985 that most of these assets were owned by an entity called Nashville Leasing. Further investigation revealed that Nashville Leasing was the name used collectively by Dr. Hoffman's children, who were jointly receiving $1,194.83 per month from SCASF under a 1982 equipment lease.
Similarly, Dr. Garner alleges that at the time of his stock purchase he was led to believe that an $80,000 note payable by SCASF to Dr. Hoffman was non-interest bearing. Dr. Garner also testified at one point during the trial that he understood that this debt would be "rescinded," but at another point said it was to be "cancelled," in June 1986 when he paid Dr. Hoffman the $119,100 still owed for his stock.
Dr. Garner therefore contends that his consent to the transaction was vitiated by fraud under La.C.C. art. 1953 because Dr. Hoffman's silence and/or suppression of the truth caused him to invest in an allegedly worthless corporation. However, this Court finds that Dr. Garner's claims are precluded by the application of La.C.C. art. 1954:
Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations.
The SCASF Financial Statements for the fiscal year ending July 31, 1982 contain full information about all of these allegedly hidden facts and transactions. The corporation's assets are shown to include equipment acquired for a minimal cost of $5029.94 with a book value of $2,208.08, and its primary liability is $80,000 in notes payable to Dr. Hoffman. Equipment rental for the year totalled $14,337.96, shown on the attached ledger sheets as paid to Nashville Leasing, and interest expense for the year was $14,433.34.
Since the complained-of transactions clearly appear on the face of these reports dated November 10, 1982, the reasonable conclusion *343 is that Dr. Garner did not see them. However, there was no testimony that Dr. Garner was not given the opportunity prior to his June 1983 stock purchase to review these or any earlier SCASF financial statements. Instead it was his testimony that he "took it at face value" when Dr. Hoffman said he only wanted to get back the money he'd put into the surgical facility. Therefore, the evidence shows that Dr. Garner could have ascertained the truth about the corporation's financial status with minimal effort and skill, but failed to make the most basic inquiry that any prudent investor would have made. And notwithstanding Dr. Garner's claim that he considered Dr. Hoffman his mentor as Chief of his Plastic Surgery residency program, this fact standing alone does not create a "relation of confidence" within the intendment of Civil Code article 1954.
In any case, the evidence does not support Dr. Garner's allegation that there was anything fraudulent about either the equipment transfer or the $80,000 note. According to a September 1980 letter from his CPA, SCASF was paying Dr. Hoffman rent for the equipment at issue, resulting in a disadvantage to Hoffman individually under the tax laws. Thus, Dr. Hoffman's subsequent transfer of ownership to his children neither stripped the corporation of assets nor increased its cash expenditures. Similarly, the note payable to Dr. Hoffman was shown to represent a portion of the substantial start-up costs of the corporation and an outpatient operating room, which in 1975 was a new phenomenon. Nothing suggests that the note did not provide on its face for interest payments, or that the interest rate was usurious or even unfair.
Dr. Garner's complaints of Dr. Hoffman's alleged self-dealing were also properly rejected. He asserts that through the interest payments to Dr. Hoffman, the equipment rents paid to Nashville Leasing, and through some employee-sharing with PSA, Dr. Hoffman's sole control of the corporation rendered the stock worthless between 1983 and 1986.
While Dr. Garner's contract for the purchase of his stock expressly reserves his 50% voting rights, minutes of the SCASF directors' meetings for 1983-86 show that only Dr. Hoffman attended. Additionally, there is no evidence suggesting that Dr. Garner took any interest in these meetings until June 9, 1986, when he asked for copies of the Corporate Articles and By-Laws and sought election as a Director.
Nor was it shown that any of these complained-of transactions were hidden from Dr. Garner; they were reflected in the annual financial statements for 1983 through 1986, and were properly proposed and voted on, where necessary, at the annual board meetings.
Finally, the allegation that Dr. Hoffman's actions harmed either the corporate entity or the stockholders was unsubstantiated. The financial reports do not reflect any significant loss of assets, and the net profits rose from $1,781.55 in 1982 to $14,255.20 for 1985.[21]
Dr. Garner's claim for rescission was properly denied.

ST. CHARLES LEASING PARTNERSHIP
Dr. Garner and Dr. Hoffman each claim that the other breached the provisions of their Buy-Sell Agreement relating to this partnership. That Agreement provides in pertinent part:
2.1 Upon a Partner's interdiction, insolvency or bankruptcy or his termination of association (on a cost-sharing basis or otherwise) with the other Partner in the practice of medicine ..., the other Partner shall have the right and option to acquire all of the Partnership interest owned by the Partner ..., and the Partner... shall be obligated to sell the Partnership interest to the other Partner. The purchasing Partner shall have ninety (90) days from the date of the Partner's ... termination of association within which to exercise his option.
* * * * * *

*344 3.1 Any Partner desiring to sell, donate, transfer or otherwise dispose of all or any part of his Partnership interest must first offer said Partnership interest to the other Partner....
3.2 It is specifically provided that the option to purchase contained in this Article III shall not apply to sales or donations between the Partners or to sales to other physicians who, upon mutual consent of the existing Partners, become Partners in St. Charles Leasing.
* * * * * *
7.1 The parties agree that if any party fails to perform any of the obligations under this Agreement, such performance may be enforced by a suit for specific performance in a court of competent jurisdiction. The prevailing party shall be entitled to reasonable attorney fees and court costs.
Dr. Garner contends that since he withdrew his consent to Dr. Elliott's admission as a partner, Dr. Hoffman breached paragraph 3.1 of this Agreement by nevertheless selling an interest to Dr. Elliott without first offering it to Dr. Garner. Based upon this alleged breach, Dr. Garner seeks damages in lieu of specific performance, plus attorney fees and court costs.
Dr. Hoffman claims that since Dr. Garner terminated their association in October 1987, Dr. Garner was obligated under paragraph 2.1 to transfer his interest to Dr. Hoffman, and was so notified in January 1988. Dr. Garner's failure to respond to this notice is asserted as a breach that entitles Dr. Hoffman to purchase Dr. Garner's interest at the current value of the assets, to recover all attorney fees and costs for this suit and to recover damages for the equipment's decline in value.
The trial court adopted the Commissioner's determination that since both Dr. Hoffman and Dr. Garner had breached their obligations as partners in St. Charles Leasing, neither was entitled to the claimed relief. We find no error in this decision.
Despite his June 26, 1986 termination letter to Dr. Elliott, Dr. Garner consented to Dr. Elliott's becoming a partner in St. Charles Leasing so as to trigger the exception of paragraph 3.2 of the agreement. Dr. Elliott participated in the PSA cost sharing arrangement effective July 1, 1983 to the extent provided in the Elliott Agreement. Although Drs. Garner and Hoffman both signed a letter to Dr. Elliott setting a June 24, 1986 deadline for Dr. Elliott's purchase into St. Charles Leasing, Dr. Garner impliedly consented to an unspecified extension of this deadline on June 25, 1986 when he signed the related documents. As we concluded above, Dr. Garner's June 26, 1986 termination letter to Dr. Elliott constituted at most the withdrawal of his individual association with Drs. Hoffman and Elliott. Under these circumstances, Dr. Hoffman did not have the obligation under paragraph 3.1 to first offer the partnership interest to Dr. Garner. The trial court did not err by denying damages for Dr. Hoffman's alleged breach of paragraph 3.1 of the St. Charles Leasing Partnership.
Although Dr. Garner instigated the PSA termination, which would have entitled Dr. Hoffman to purchase Dr. Garner's interest, Dr. Hoffman made no attempt to do so until January 1988. The 90 day period to exercise his option under paragraph 2.1 was expired. In the meantime, though, Dr. Hoffman rejected Dr. Garner's September 1986 offer to purchase his interest and limited Dr. Garner's use of some of the partnership equipment. Dr. Hoffman also refused several requests for access to items that were in storage which might have been used by Dr. Garner. Finally, both parties apparently agree that the equipment has been allowed to deteriorate in value pending this litigation, despite the continued existence of the partnership. Under these circumstances, denial of the claims by both parties was proper and just.

EAST JEFFERSON MEDICAL OFFICE BUILDING PARTNERSHIP
Dr. Garner relies on La.C.C. art. 1967 to contend that he is entitled to restitution from Dr. Hoffman and Dr. Elliott for two-thirds of all expenses incurred and obligations assumed *345 in connection with the East Jefferson Medical Office Building.
Article 1967:
Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
Under this provision Dr. Garner bears the burden of proving that a promise was made, that he justifiably relied on that promise, and that as a result he changed his position to his detriment. South Central Bell Telephone Co. v. Rouse Co., 590 So.2d 801 (La.App. 4th Cir.1991). The Commissioner recommended that this claim be denied because Dr. Garner did not carry his burden of proof. The trial court accepted that recommendation. We affirm.
The evidence shows that after an initial $3,000.00 deposit and a Letter of Intent was submitted in June 1985 to the developer of the building, Dr. Garner and Dr. Elliott attended occasional informational meetings through November 9, 1985.[22] Most correspondence was directed to Dr. Garner, but he generally circulated it to the other two physicians and the Office Manager. A prospectus and sample contracts were received in early November 1985, and Dr. Garner asked Mr. Mendler's law firm for a review and recommendation. A response was directed to Dr. Garner on November 25, 1985 and all services in connection with this review were billed to G-Corporation, not PSA.
Dr. Garner testified that there was an informal discussion between the three doctors at PSA's offices after December 12, 1985, the original deadline to execute the Limited Partnership and Lease contracts, but before December 23, 1985. At this meeting, Dr. Hoffman allegedly stated to Dr. Garner and Dr. Elliott that the St. Jude deal had fallen through and he decided to go ahead with plans for offices in the East Jefferson Medical Office Building. Dr. Hoffman could not sign the lease because he was not on the active staff at East Jefferson General Hospital, and Dr. Hoffman did not want Dr. Elliott to sign anything because he was not yet a full associate in PSA. Dr. Garner contends that it was thus agreed that initially only Dr. Garner would sign the necessary documents. As soon as possible, though, a written partnership agreement was to be executed between the three doctors whereby the partnership would assume the East Jefferson Medical Office Building Limited Partnership interest and the other two doctors would then sign the Lease Agreement.
Although Dr. Garner had a general practice of memorializing such discussions and resultant decisions by memo or letter, he made no documentation about this alleged "meeting." Both Dr. Hoffman and Dr. Elliott specifically denied any such conversation or that either had at any time made a commitment. Dr. Hoffman admitted that on December 9, 1985 Dr. Garner told him that the Act of Sale was set for December 12th; since he felt he had never agreed to a commitment on this deal, Dr. Hoffman explained, he did not feel that he should have then told Dr. Garner that he was not going to participate in this investment.
On December 23, 1985 Dr. Garner executed a Subscription Agreement for 2600 units in the East Jefferson Medical Office Building Limited Partnership for $44,824,00 and signed a mandatory 10-year lease for a first floor office in the building. The latter document shows clearly that Dr. Garner signed on behalf of his corporation and with the designation "(1/3)" behind his signature.
On learning in early January 1986 that Dr. Garner had executed these documents, Dr. Hoffman and Dr. Elliott recalled expressing their shock at his action; they also immediately denied any intent to be bound by Dr. *346 Garner's signature. Dr. Hoffman testified that he emphatically told Dr. Garner that at his time in life (his 57th birthday was a month away), he had no intention of entering into a ten-year lease. He offered to assist Dr. Garner in any way to rescind his obligations including absorbing some legal fees. Dr. Elliott recalls only reiterating what he had said all along: that he would go along with whatever Dr. Hoffman decided, even though moving to the new building was his idea in the first place and he had always been the most enthusiastic about it.
After the first week of January 1986, Dr. Garner, Dr. Elliott and their office manager, Robert Johnson, continued to meet with architects and interior design representatives to plan the layout of the first floor office space in the building; it was shown that Dr. Hoffman even attended one such meeting. Mr. Johnson recalls that his impression well into early 1986 was that this space would be used as PSA's outlying office for East Jefferson, based upon these joint discussions.
Dr. Garner argues that since the Letter of Intent was signed and submitted with money from all three doctors in June 1985 and because an agreement was reached at the informal discussion in December, the later attempt by Dr. Hoffman and Dr. Garner to withdraw their commitment was ineffective. He claims support for this view rests on the later participation of Dr. Elliott, the PSA manager and even Dr. Hoffman in the development of plans for the layout of the new office.
On the conflicting evidence, however, the trial court could reasonably conclude that there had been no meeting in December 1985 or that, even if a discussion had occurred, there had been no expression of commitment by either Dr. Hoffman or Dr. Elliott. Alternatively, the evidence supports the conclusion that when the amount of money and length of time involved in the purchase of the Limited Partnership interest and the execution of the lease is considered, the vague, undocumented commitment Dr. Garner allegedly received was so minimal and nonspecific that his reliance was unreasonable.
In addition, the alleged joint participation in planning the new office layout is not persuasive evidence that either Dr. Hoffman or Dr. Elliott intended to become co-obligors with Dr. Garner. G-Corporation had in 1984 executed a separate contract for office space and employees on the West Bank which did not obligate PSA or Dr. Hoffman for any of the costs. By special agreement, however, the costs were in fact paid by PSA and then apportioned as with the other outlying offices. A similar arrangement for the space in the East Jefferson Medical Office Building could have been intended. Since the relationship between the doctors was terminated before the new space was completed, Dr. Garner has no claim for restitution under this view either.
Since the evidence was conflicting but reasonably supports the conclusion that Dr. Garner did not prove a promise sufficient to justify his reliance, there is no manifest error in the trial court's denial of this claim.

DECREE
The judgment rendered June 23, 1992 is reversed in part and amended in part to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Onyx P. Garner, Jr. and Onyx P. Garner, Jr., M.D. a Professional Medical Corporation prohibiting George W. Hoffman, individually and George W. Hoffman, M.D. a Professional Medical Corporation from interfering with Dr. Garner's right to joint possession of 3600/3602 St. Charles Ave. without the payment of rent and from interfering with his exercise of occupancy, control and management of the building in the future, including the issuance of leases, the renewal thereof and the possession by him and his employees of keys to the premises;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of L. Franklyn Elliott, II, M.D. and against George W. Hoffman individually and George W. Hoffman, M.D. a Professional Medical Corporation jointly and in solido in the sum of $3,652.25 with legal interest from June 30, 1986 until paid;

*347 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of George W. Hoffman, M.D., a Professional Medical Corporation, and against Onyx P. Garner, Jr., M.D., a Professional Medical Corporation in the sum of $67,635.76 with legal interest from December 5, 1986, the date of judicial demand, until paid;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the rights of L. Franklyn Elliott, II, M.D. to all funds, including interest, held in escrow by George W. Hoffman, M.D., individually and/or by George W. Hoffman, M.D., a Professional Medical Corporation, pursuant to their Agreement of July 3, 1987, is recognized; and
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all further claims and reconventional demands of the parties are denied.
As amended, the judgment is AFFIRMED. All costs of this appeal are to be borne by Onyx P. Garner, Jr. and Onyx P. Garner, Jr., M.D., a Professional Medical Corporation.
REVERSED IN PART, AFFIRMED IN PART, AND AMENDED IN PART.
NOTES
[1] Although Dr. Garner's attorney objected to Mr. Mendler's appearance as a witness and the introduction of documents from his client files, the Commissioner ruled that the privilege had been waived by litigating the subject matter of the joint representation. That ruling is not challenged on appeal.
[2] Although the doctors originally planned to form a partnership between their corporations, a 1982 amendment to federal tax laws made that arrangement extremely disadvantageous.
[3] Evidence showed that the initial partnership assets consisted of equipment formerly owned by H-Corporation ($17,062.50) and formerly owned by the sole proprietorship ($49,860) but purchased in part by Dr. Garner as his contribution to the St. Charles Leasing Partnership. The items were primarily those used in the clinic practice, not in the surgical facility.
[4] $1 million total value less a "rounded-down" principal balance on December 31, 1982 of $389,000 = $611,000 net equity × 28.11% = $717,752.10.
[5] Originally held on a weekly basis, at some point the meetings were curtailed to once a month due to scheduling difficulties.
[6] The PSA checking account required both Dr. Hoffman's and Dr. Garner's signatures.
[7] Although Dr. Hoffman's Answer to the appeal specifies error in the trial court's award of injunctive relief to Dr. Garner, that issue is not raised in his brief and is therefore abandoned. Uniform Rules of LouisianaCourts of Appeal, Rule 2-12.4.
[8] Dr. Elliott's testimony also began on this date, but nothing crucial to any factual or legal issue appears that was not covered in the repetitious questioning by all counsel during subsequent days.
[9] It is noted that, under Dr. Hoffman's interpretation, Dr. Garner was not permitted to terminate the association if he died, retired or became disabled.
[10] However the parties specifically provided "The Agreement shall not be construed as an employer-employee relationship."
[11] As detailed later in this opinion, Dr. Garner's termination of the PSA Agreement occurred in July 1986 and was effective at the end of October 1986.
[12] It is noted that since a written stipulation by Drs. Hoffman and Elliott regarding this claim was both filed in the pleadings of case # 86-13902 and into evidence during trial, the trial court could reasonably conclude that Dr. Hoffman had consented to a judgment against him for this amount.
[13] Dr. Elliott does not argue that he is owed any contractual penalty or consequential damages for Dr. Garner's termination of the Elliott Agreement.
[14] The amount of expense reimbursement claimed at trial, discussed in footnote 15, was not based on the altered formula. However, plaintiffs' exhibit G-381 makes it clear that at the time of these events H-Corporation asserted that G-Corporation owed the revised amounts.
[15] See plaintiffs' exhibits G-14, G-16, G-20, G-34, G-17 and defense exhibit HE-158.
[16] This figure is taken from defense exhibit HE-275, explained through the testimony of Dr. Hoffman's CPA, Beverly Nichols. Although on cross examination plaintiffs' attorney challenged these expense figures as overly inclusive, as is argued here, he failed to elicit sufficient detail regarding the amount of the contested items for this Court to make any downward adjustments. Dr. Garner and G-Corporation therefore failed to carry their burden of rebutting the amount of the claim.
[17] Interestingly, Dr. Garner makes no claim for any of the other "assets" even though the average total for January through May 1986 came to over $37,000.
[18] Ms. Aversa recalls being instructed not to process Dr. Garner's billings after the controversy between the doctors had become common knowledge to the office staff, in July or August 1986.
[19] Owen Dahl, whose firm took over Dr. Garner's collections in September 1986, found that Dr. Garner's collection rates were 81.4% in 1984, 67.7% in 1985, and 84.5% for the first seven months of 1986. Based upon his review of national data, a consistent ratio of 84% "is not too bad." In comparison, Dr. Elliott's collection ratios were 55.3% in 1984, 78.9% in 1985 and 90.8% for the first seven months in 1986. Dr. Hoffman's ratios were not comparable; he always exceeded 100% because the majority of his patients paid in advance for their elective procedures.
[20] At this point, both Dr. Garner and Dr. Crais were discussing purchasing into the various practice entities with Dr. Hoffman.
[21] Although 1986 net income dropped to under $5,000, the turmoil in the practice could explain this decline. In any case, Dr. Garner's suit was filed August 1, 1986 when the reports for the fiscal year ending July 31 would not have been available.
[22] It was established that the developer of the project did not claim that everyone who signed a Letter of Intent was obligated to go forward as an investor in the building; it was merely a way of gauging the interest of the medical community.